## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

ANTOINETTE PORTILLO, individually and
on behalf of a class of similarly situated
individuals,

       *Plaintiff*,

v.

NEBULA GENOMICS, INC., a Delaware
Corporation, META PLATFORMS, INC.*, a*
Delaware Corporation, MICROSOFT
CORPORATION, a Washington Corporation,
and GOOGLE LLC, a Delaware Limited
Liability Company,

       *Defendants*.

Case No. 24-CV-9894

JURY DEMAND

## CLASS ACTION COMPLAINT

1.     Plaintiff Antoinette Portillo brings this class action on her own behalf and also on behalf of all others similarly situated ("Class Members") against Defendant Nebula Genomics, Inc. ("Nebula").

2.     Nebula is a for-profit corporation which owns and operates a platform for DNA testing and analysis, Nebula.org. To use its services, customers must first visit Nebula's website and order a DNA test or, if they have already taken a DNA test (from Nebula or any other genetics testing service), create an account and upload their DNA test results. Nebula's customers can then use its platform to perform analyses on their DNA and produce various reports derived from their genetic code. By doing so, Nebula allows its customers to make discoveries and insights about their ancestry, health, fitness, and much more.

3.      But that's not all Nebula does with its customers' genetic data. Unbeknownst to its customers, Nebula shares their highly sensitive and personal genetic test results with third parties, entirely without the customer's consent.

4.      Worst of all, Nebula's disclosure of its customers' genetic test results also includes unique personal information sufficient to identify them. As a result, the third parties to whom Plaintiff's genetic information has been disclosed – specifically Defendants Meta Platforms, Inc. ("Meta"), Microsoft Corporation ("Microsoft"), and Google, LLC ("Google") three of the largest technology companies in the world – have gained specific knowledge of Plaintiff's and Class Members' genetic makeup, including their genetic predisposition to medical conditions, disease, ethnicity, and physical characteristics.

5.      Meta, Microsoft and Google use the Plaintiff's and Class Members' data collected from Nebula to make money. Specifically, Meta, Microsoft and Google sell targeted ads, i.e., ads that are directed to a unique internet user based upon the profiles both companies have compiled on that unique internet user. These companies make billions of dollars annually from their targeted ad revenue.

6.      Nebula's practice of disclosing its customers' genetic information to third parties without first obtaining consent poses serious and irreversible privacy risks. Nebula's disclosure of sensitive genetic information also violates the Illinois Genetic Information Privacy Act, 410 ILCS 513, *et seq.* ("GIPA"), which makes it unlawful for companies that collect genetic information to disclose such information without first obtaining written authorization.

7.      Meta, Microsoft and Google benefit from their collection of Plaintiff's and Class Members' genetic data because it enhances the profile each company has compiled as to Plaintiff and each Class Member, thereby making their targeted ads more valuable to their customers.

2

Given that this data is among Plaintiff's and Class Members' most private information, and that it is expressly protected from disclosure by GIPA, it is inherently unjust that Meta, Microsoft and Google retain this benefit.

## PARTIES

8.     Plaintiff Antoinette Portillo is a natural person who resides in Chicago, Illinois.

9.     Defendant Nebula Genomics, Inc. is a corporation organized and existing under the laws of Delaware, with its principal place of business located at 711 Stewart Ave., Ste. 200, Garden City, New York, 11530. Nebula does business throughout the State of Illinois, the Northern District of Illinois, and throughout the United States.

10.     Defendant Meta Platforms, Inc. is a Delaware corporation with its principal place of business in Menlo Park, California. Meta is the developer and operator of the Facebook social media platform, as well as the Facebook pixel, a business analytics tool.[1]

11.     Defendant Microsoft Corporation is a Washington corporation with its principal place of business in Redmond, Washington. Microsoft is the developer and operator of the business analytics tools Microsoft Conversion Tracking and Microsoft Clarity.

12.     Defendant Google LLC is a Delaware limited liability company with its principal place of business in Mountain View, California. Google is the developer and operator of the Google Analytics platform for providing web and mobile analytics data, as well as the Google Tag Manager, a business analytics tool.

## JURISDICTION AND VENUE

---

[1] Meta has recently begun to refer to this tool as the "Meta pixel." Because it has been historically referred to as the "Facebook pixel," and is still sometimes described as such both by Meta and by third parties, this Complaint refers to this tool as the Facebook pixel.

3

13.     This Court has personal jurisdiction over Defendants because: (i) they transact business in this District; (ii) they have substantial aggregate contacts in this District; (iii) they engaged, and continue to engage in, conduct that has a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons in this District. Specifically, as evidenced by Plaintiff's use of Nebula.org described herein, Nebula actively markets and sells use of its Nebula.org platform to Illinois residents and in so doing violates the genetic privacy rights of Illinois residents. Similarly, Meta, Microsoft and Google have unjustly benefited from their collection of genetic data from Plaintiff and other Illinois residents as described herein.

14.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. 1332(d): (i) this is a class action in which the matter in controversy exceeds the sum of $5,000,000, exclusive of interest and costs; (ii) there are 100 or more class members; and (iii) some members of the class are citizens of states different from Defendants.

15.     Venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391(b)(2) because a substantial part of the acts or omissions giving rise to the claims alleged herein occurred in this District. Additionally, venue is proper under 28 U.S.C. § 1391(b)(3) because this Court has personal jurisdiction over Defendants.

## BACKGROUND

### I.    The Danger of Disclosing an Individual's Genetic Information

16.     There are many beneficial uses for genetic information, including detecting and preventing illnesses, aiding in criminal investigations, or uncovering a person's family history.

17.     Yet this data may also be exploited for discriminatory and abusive purposes, which led to the enactment of the federal Genetic Information Nondiscrimination Act of 2008,

42 U.S.C. § 2100ff *et seq.* to address the impermissible discrimination against individuals based on their genetic makeup.

18.     Genetic information is unique to an individual, and thus can be used to identify that individual in the same way as a fingerprint, voice print, or other biometric identifier. Unlike other immutable and unique characteristics, however, an individual's genetic information reveals more than their identity; it can also be used to assess the likelihood, for example, that the individual's ancestors came from a specific part of the world, or that they are prone to premature baldness, or that they are at a higher risk for cardiovascular disease. Thus, genetic information is not only a unique identifier, but has also been described as "a person's book of life." *The Law of Genetic Privacy: Applications, Implications and Limitations*, Journal of Law and Biosciences (Oct. 2019).

19.     Simply put, genetic information is the most sensitive and private information that exists for every individual. Disclosure of an individual's genetic information results not only in a fundamental invasion of privacy but can also lead to discrimination on a vast variety of grounds not only against the individual, but also against family members. These types of abuses can be accomplished with access to even a small amount of a person's genetic information.

20.     For these reasons, an individual's genetic information has implications for his or her family members and future generations, and the misuse of genetic information could have intergenerational effects that are far broader than any individual incident of misuse.

**II.     The Illinois Genetic Information Privacy Act**

21.     To address the myriad of dangers that can arise from the disclosure of an individual's genetic information, in 1998 the Illinois Legislature enacted the Illinois Genetic Information Privacy Act ("GIPA"), 410 ILCS 513/1 *et seq.* Prior to enactment of GIPA, an

individual's genetic test results were not considered confidential information under Illinois law. The Illinois Legislature recognized the significance of this, noting that "[d]espite existing laws, regulations, and professional standards which require or promote voluntary and confidential use of genetic testing information, many members of the public are deterred from seeking genetic testing because of fear that test results will be disclosed without consent in a manner not permitted by law or will be used in a discriminatory manner." 410 ILCS 513/5.

22.     To that end, the Illinois Legislature enacted GIPA, recognizing that "[t]he public health will be served by facilitating voluntary and *confidential* nondiscriminatory use of genetic testing information." *Id.* (emphasis added). In short, GIPA simply says that the results of a DNA or genetic test are confidential, that the person that had that test is the one that is entitled to the results, and that no one else can have those results without that person's knowledge or permission.

23.     To achieve this goal, GIPA proscribes any person from, among other things, disclosing genetic testing and information derived from genetic testing to any person other than the individual tested or to persons specifically authorized in writing in accordance with the Act. *See* 410 ILCS 513/15(a). Furthermore, GIPA also makes it unlawful to disclose to a third party even that an individual has undergone any genetic testing at all. 410 ILCS 513/30(a).

24.     GIPA defines "genetic information" as synonymous with the broad definition set forth in the federal Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), and specifically the broad definition set forth in 45 CFR 160.103[2]:

> *Genetic information* means … information about (i) the individual's genetic tests;
> (ii) The genetic tests of family members of the individual; (iii) The manifestation
> of a disease or disorder in family members of such individual; or (iv) Any request

---

[2] 410 ILCS 513/10.

for, or receipt of, genetic services, or participation in clinical research which includes genetic services, by the individual or any family member of the individual.[3]

25.     GIPA provides a private right of action for "[a]ny person aggrieved by a violation of this Act." 410 ILCS 513/40(a). The statute provides for recovery of the greater of liquidated damages of $2,500 or actual damages for each negligent violation, and the greater of $15,000 or actual damages for each intentional or reckless violation. 410 ILCS 513/40(a)(1)-(2). GIPA also provides for recovery of reasonable attorneys' fees and injunctive relief.

26.     As discussed throughout this Complaint, Defendant Nebula has violated both sections 15 and 30 of GIPA by disclosing to third parties – specifically, Defendants Meta, Microsoft and Google – that Plaintiff and the Class Members have undergone genetic testing, and also by disclosing the genetic information generated by that testing. Defendant Nebula neither requested nor obtained written consent from Plaintiff and Class Members prior to disclosing their genetic information to third parties, including Defendants Meta, Microsoft and Google.

III.     **How Nebula Collects Genetic Information**

27.     Nebula is a commercial genetics company that claims to offer its customers "Whole Genome Sequencing," a form of genetic analysis that will "Decode 100% of Your DNA."[4]  Customers who utilize Nebula's DNA test can not only "learn about your ancestry and find new relatives," but also "find the right exercise plan to lose weight," "learn about the

---

[3] 45 CFR 160.103. The regulation defines "genetic test" to mean "an analysis of human DNA, RNA, chromosomes, proteins, or metabolites, if the analysis detects genotypes, mutations, or chromosomal changes." Furthermore, "genetic services" is defined as "(1) A genetic test; (2) Genetic counseling (including obtaining, interpreting, or assessing genetic information); or (3) Genetic education."
[4] https://nebula.org/whole-genome-sequencing-dna-test/ (last viewed October 2, 2024).

genetics of your mind, behavior and personality," and even "use your genetic information to extend your life."[5]

28.    Defendant also offers DNA analysis for customers who have taken a DNA test offered by another genetic testing company, such as Ancestry.com or 23andme. According to its website, Nebula's analysis "will 'fill in the blanks' in your raw data," resulting in an "expanded data file" containing "**50 times more information** than in the original raw data file from your DNA testing service!"[6]

29.    Based on the "expanded data file," Nebula offers its customers personalized reports on hundreds of topics, enabling its customers to determine whether their DNA makes them predisposed to diseases, certain physical characteristics, or how their genetic makeup might affect personality and even income. This analysis is driven by the constantly-updated Nebula Library, which enables Nebula's customers "to stay up to date with the latest discoveries in human genomics and how they may relate to you."[7]

**IV.    How Nebula Violates GIPA**

30.    Demonstrating its understanding of the sensitivity of genetic information, Nebula touts its service as "Privacy First DNA Testing."[8] According to Nebula, while "Other DNA Tests" will "[s]ell customer genomic data," Nebula's customers are able to "[a]ccess technology that enables you to have ***full ownership and control over your genomic data***."[9]

---

[5] *Id.*
[6] https://nebula.org/free-dna-upload-analysis/ (emphasis in original) (last viewed October 2, 2024).
[7] https://nebula.org/blog/category/reports/ (last viewed October 2, 2024).
[8] https://nebula.org/whole-genome-sequencing-dna-test/
[9] *Id.*(emphasis added).

31.     Indeed, Nebula notes on its website that "the primary reason why people haven't had their DNA sequenced is due to ***concerns about privacy and control of genetic data***."[10] Nebula goes on to reassure its potential customers that it offers "a new approach" that distinguishes it from other genetic testing companies:

> It's a key question at a time when every kind of data privacy seems to be an illusion. Facebook has been a front page new story for its ongoing data privacy scandals. …
>
> Your DNA could be used for more than just catching criminals. The same approach could be used by authoritarian governments to discriminate against or prosecute groups of people. Discrimination by non-government organizations is likely to be much more common. …
>
> If you can't rely on data protection and nondiscrimination laws or company privacy policies, and if the very business model of most direct to consumer genetic testing companies is based on selling your personal data, how can consumers preserve their data privacy and still get the benefits of a DNA test and help accelerate medical breakthroughs?
>
> **Good news, there's a new approach**
>
> We believe the solution for private DNA testing lies in technology rather than policies, which is exactly the approach of Nebula Genomics. What sets Nebula apart is that we're committed to developing technology to protect the privacy of your genetic data and enable you to share it controllably and securely.

32.     Notwithstanding its professed commitment to the privacy of its customer's genetic information, Nebula continuously and constantly shares that information with third parties, including Defendants Meta, Microsoft and Google. Nebula does so because it has enabled analytics and advertising tools on its website, specifically the Facebook pixel, Microsoft Conversion Tracking, Microsoft Clarity, and Google Analytics and Tag Manager.

---

[10] https://nebula.org/blog/dna-privacy/ (emphasis in original) (last viewed October 2, 2024).

A. *Facebook Pixel*

33.     As described on Facebook's website, the Facebook pixel is a "piece of code for your website that lets you measure, optimize and build audiences for your ad campaigns."[11] More specifically:

> Once you've set up the Facebook pixel, the pixel will activate when someone takes an action on your website, including visiting your website. The pixel receives these actions, or events, which you can view on your Facebook pixel page in Events Manager. From there, you'll be able to see the action that your constituents, voters or supporters take.[12]

34.     The Facebook pixel not only shows website operators such as Nebula what users are clicking on and looking at on their website, but it also enables the website operator to know *who* is doing what on the website. This is because the Facebook pixel utilizes each user's Facebook ID, a unique identifier assigned to each Facebook user and used to track user activity and personalize the user's experience. Facebook's website confirms that by using the Facebook pixel, Nebula is sending to Facebook each activity that its users take on the website: "You'll also have options to reach your community again through future Facebook ads by retargeting those who have interacted with your website."[13]

35.     When a person signs up for Facebook, Facebook assigns them a unique Facebook ID number. The Facebook ID number is a digital address that allows any ordinary person to identify the Facebook user. For example, you can Google search the word "Facebook" and a given Facebook ID number, and the Facebook user's profile will return in the search. Even more

---

[11] https://www.facebook.com/government-nonprofits/blog/the-facebook-pixel#:~:text=The%20Facebook%20pixel%20is%20a,people%20take%20on%20your%20website (last viewed October 2, 2024).
[12] *Id.*
[13] *Id.*

straightforward, a person can go directly to a user's Facebook profile by appending the Facebook ID to the end of "facebook.com" and typing it into the address bar of any internet browser.

36.     The Facebook ID, in this context, constitutes Personally Identifiable Information, in that it operates as a unique identifying number or code that can be linked to an individual's identity.

37.     When a user logs into Facebook using an internet browser, such as Google Chrome or Microsoft Edge, Meta places several cookies on the user's browser.

38.     A "cookie" is a piece of code placed on a browser by a server that receives information stored by the cookie. A cookie can store different types of information, but the basic function is to identify a) the user and b) the website the user visited that placed the cookie to begin with.

39.     One of the cookies placed by Meta on a user's browser upon login is the "c_user" cookie which contains the user's Facebook ID number. This cookie remains on a user's browser as long as they do not hit "Log Out" when they leave Facebook. Even if the user never visits Facebook.com using that browser again, the cookie will remain on the device for one year after the user's last visit to Facebook.

40.     The long life of the c_user cookie is intentional—not only does the cookie allow Meta to identify users when they visit Facebook.com, it also allows Meta to track the user's activity across the web on the same browser. Because the Facebook ID is specific to a person, Meta can match up a user's activity across devices using different browsers. This enables Meta to know, for example, that a single user is accessing the internet from a cell phone, a laptop, and

11

a tablet. Meta can compile a comprehensive user profile across devices and see which websites were visited on each device.[14]

41.     By tracking a specific user's movements across the web and across devices, all enabled by the Facebook ID, Meta collects enormous amounts of data regarding a user's interests, behavior, and connections.[15] The quantity and quality of this data allows Meta to generate billions in advertising revenue—allowing businesses to target users with specific interests, target advertisements to specific users who visited their site but did not complete a purchase, and to analyze the types of Facebook users that are visiting their site by leveraging user demographics, interests, and behaviors on other websites.

42.     Businesses, including Nebula, access these services from Meta in part by installing the Facebook pixel on their website.

43.     Pixels, also known as "web beacons," are often small transparent images that an internet browser downloads like any other image on a website. When a user visits a web page which contains the Facebook pixel, the pixel is programmed to contact the Facebook ad server.

44.     The business installing the pixel can program the pixel to contact Meta when users engage in specific conduct on the business's website, such as when a user places an item in their shopping cart, makes a purchase of an item or a service, clicks a certain button, or otherwise interacts with the website.[16] When the user has an active c_user cookie on their browser, and when the pixel is programmed to convey information about specific conduct (referred to as

---

[14] *See* https://www.facebook.com/business/news/cross-device-measurement (last viewed October 2, 2024).

[15] *See* https://www.facebook.com/business/ads/ad-targeting (last viewed October 2, 2024).

[16] *See* https://developers.facebook.com/docs/meta-pixel/advanced (last viewed October 2, 2024).

"events"), Meta receives the event information along with the user's Facebook ID, thus connecting the specific Facebook user ID with the event-related information sent by the website.

45.    If a business does not install the pixel, information about the user's actions on the website is not communicated to Meta.

46.    Nebula and other businesses using Meta services know that Meta can identify the Facebook users visiting their websites. The value for the business in programming their website with the Facebook pixel is derived from Meta's ability to identify the website visitors and link them to Facebook data on their interests, behaviors, and connections, and to allow the business to target or retarget advertisements to specific users. This enables businesses to, for example, target users who have purchased one product with advertisements for similar products, or companion products. One of the primary purposes for businesses who install the Facebook pixel is to enable the business to engage in remarketing campaigns where users who have engaged in specific behaviors on their website can be targeted with advertisements designed to encourage a subsequent behavior. For example, a consumer who placed an item in their "cart" might be targeted with remarketing ads for that item until the user completes the purchasing process.

47.    At an unknown date, Nebula installed the Facebook pixel on its website.

48.    Nebula programmed the Facebook pixel to collect and transmit to Meta certain information about the online conduct of consumers on its website, including information regarding consumers' purchases and registrations of genetic testing kits.

49.    Nebula programmed its website to send this information to Meta along with the consumer's unique Facebook ID contained in the c_user cookie.

50.     Specifically, once a user signs up on Nebula.org, an HTTP session is sent to Meta confirming that the customer has completed the signup process and registered a DNA test kit, as shown in the following image:



51.     Nebula also discloses to Meta when a customer has purchased a testing kit, as shown in the following image:

+ https://www.facebook.com/tr/?id=2199885286711332&ev
=SubscribedButtonClick&dl=https%3A%2F%2Fnebula.org%2F
whole-genome-sequencing-dna-test%2F&rl=https%3A%2F%2F
portal.nebula.org%2F&if=false&ts=1676818160643&cd[but
tonFeatures]=%7B%22classList%22%3A%22[cart-button]%20pl
an__btn%22%2C%22destination%22%3A%22%22%2C%22id%22%3
A%22%22%2C%22imageUrl%22%3A%22%22%2C%22innerText%22%3
A%22Buy%2F[Ultra%20Deep%20DNA%20Test%20Bundle]%5CnAdde
d%22%2C%22numChildButtons%22%3A0%2C%22tag%22%3A%22bu
tton%22%2C%22type%22%3A%22null%22%2C%22name%22%2C%22
22value%22%3A%22%22%7D&cd[buttonText]=[Buy%20Ultra%20D
eep%20DNA%20Test%20Bundle%0AAdded]&cd[formFeatures]=%
5B%5D&cd[pageFeatures]=%7B%22title%22%3A%22Nebula%20G
enomics%20-%2030x%20Whole%20Genome%20Sequencing%20-%2
0DNA%20Testing%22%7D&sw=1920&sh=1080&v=2.9.96&r=stabl
e&ec=2&o=30&cs_est=true&fbp=fb.1.1676816610118.184527
5783&it=1676818157351&coo=false&es=automatic&tm=3&rqm
=GET

HEADERS
+ accept:          image/avif,image/webp,image/apng,im
                  age/svg+xml,image/*,*/*;q=0.8
+ accept-          gzip, deflate, br
  encoding:
+ accept-          en-US,en;q=0.9
  language:
+ connection:      keep-alive
+ cookie:          sb=7jDyY_4Ag4IMnlYFmJKIJoDC;
                  datr=8zDvY-4H8ViDB8IgkXRgj7vX;
                  [c_user=10                    ]
                  xs=29%3AqE7ZjPWa-
                  rei5Q%3A2%3A1676816652%3A3A-1%3A-1;
                  fr=0jJzqUInRIGakIpeD.AWUYwJU6mVSJmR
                  mYbYDCLtTo5Mc.Bj8jDu.1l.AAA.0.0.Bj8
                  iFZ.AWXxTGJRCtY

52.     Nebula does not disclose to its users that it sends such information to Meta, nor does it seek or obtain its users' consent to send such information to Meta. Accordingly, for every Nebula user with Facebook accounts – including Plaintiff and Class Members with Facebook accounts – who has visited Nebula.org's website and used its DNA analysis services, Nebula has communicated to Meta that the user has undergone genetic testing, in violation of GIPA.

   B.   *Microsoft Conversion Tracking*

53.     According to Microsoft, "[w]ith conversion tracking, you can track what people do once they get to your website."[17] Microsoft specifically states that the use of conversion tracking "needs to be able to collect data from your website" using "Universal Event Tracking."[18]

---

17

https://help.ads.microsoft.com/apex/index/3/en/56710#:~:text=With%20conversion%20tracking%2C%20you%20can,count%20it%20as%20a%20conversion (last viewed October 2, 2024).
[18] *Id.*

54.     Per Microsoft, the data collected by conversion tracking is extensive, including "Interactions: clicks, scroll," "Purchase cart extraction (product name, price, number of products)," and "Event type."[19] And like the Facebook pixel, it also assigns and transmits to Microsoft the user's unique Microsoft user ID ("MUID").[20]

55.     Much like the Facebook ID described above, the MUID cookie is a unique identifier generated by Microsoft and assigned to a specific browser to track users' activity across the internet.[21]

56.     The MUID, in this context, constitutes Personally Identifiable Information, in that it operates as a unique identifying number or code that can be linked to an individual's identity.

57.     At an unknown date, Nebula installed the Microsoft Conversion Tracking on its website.

58.     Nebula programmed this tracker to collect and transmit to Microsoft certain information about the online conduct of consumers on its website, including information regarding consumers' purchases and registrations of genetic testing kits.

59.     Nebula programmed its website to send this information to Microsoft along with the consumer's unique MUID contained in the MUID cookie.

60.     Specifically, once a user signs up on Nebula.org, an HTTP session is sent to Microsoft confirming that the customer has completed the signup process and registered a DNA test kit, as shown in the following image:

---

[19] https://help.ads.microsoft.com/#apex/ads/en/53056/2 (last viewed October 2, 2024).
[20] *Id.*
[21] *Id.*



61.     Nebula also discloses to Microsoft when a customer has purchased a testing kit, as

shown in the following image:



62.     Nebula does not disclose to its users that it sends such information to Microsoft,

nor does it seek or obtain its users' consent to send such information to Microsoft. Accordingly,

for every Nebula user – including Plaintiff and the Class – who has visited Nebula.org's website

and used its DNA analysis services, Nebula has communicated to Microsoft that the user has undergone genetic testing, in violation of GIPA.

    *C. Microsoft Clarity*

63.    Through its use of Microsoft Clarity, Nebula discloses its users' detailed genetic information to Microsoft. Clarity is a session replay tracker employed by website owners to allow them to replay the activities of their site's visitors. Therefore, it is able to record every keyboard input, mouse movement, and click made by a visitor on a website, enabling website owners to comprehend how visitors interact with the website.

64.    Microsoft is the owner and operator of a Session Replay Code called Clarity, which tracks and provides information about website user sessions, interactions, and engagement, and breaks down users by device type, county, and other dimensions.[22]

65.    Microsoft states that "Clarity is a user behavior analytics tool that helps you understand how users interact with your website. Supported features include:

- Session Recordings

- Heatmaps (or heat maps)

- ML Insights."[23]

66.    Microsoft further represents that Clarity "offers many unique features that help you understand user behavior: …Data is analyzed and ready to view in near real time, so you

---

[22] 5 Jono Alderson, An Introduction to Microsoft Clarity, Yoast, https://yoast.com/introduction-microsoft-clarity/ (last viewed October 2, 2024).

[23] Frequently Asked Questions, https://learn.microsoft.com/en-us/clarity/faq (last viewed October 2, 2024).

18

don't have to wait…Deep AI and Machine Learning algorithm-powered insights help you analyze user behavior efficiently."[24]

67.    Specifically, Clarity can capture a user's interactions with a website, logging every website user's mouse movements and clicks, scrolling window resizing, user inputs, and more.[25] Indeed, Clarity organizes the information it captures into over 30 different categories including: the date a user visited the website, the device the user accessed the website on, the type of browser the user accessed the website on, the operating system of the device used to access the website, the country where the user accessed the website from, a user's mouse movements, a user's screen swipes, text inputted by the user on the website, and how far down a webpage a user scrolls.[26]

68.    For website operators such as Nebula who have enabled the Clarity tool, all website pages send multiple encoded HTTP sessions to Clarity at regular intervals.

69.    Clarity also transmits to Microsoft the users' unique MUIDs along with their website interactions, which it assigns to specific users so their website activity can be monitored over time across the internet.

70.    The MUID, in this context, constitutes Personally Identifiable Information, in that it operates as a unique identifying number or code that can be linked to an individual's identity.

71.    At an unknown date, Nebula installed the Microsoft Clarity tracker on its website.

72.    Nebula programmed this tracker to collect and transmit to Microsoft certain information about the online conduct of consumers on its website, including information

---

[24] *Id.*
[25] Clarity Data Collection, Microsoft, https://docs.microsoft.com/en-us/clarity/clarity-data (last viewed October 2, 2024).
[26] https://learn.microsoft.com/en-us/clarity/filters/clarity-filters (last viewed October 2, 2024).

regarding consumers' purchases and registrations of genetic testing kits as well as information regarding the specific results and analysis of their genetic tests.

73.     For example, for Nebula users such as Plaintiff and Class Members who have uploaded their DNA test kit results to Nebula, Nebula offers a complimentary report on different genetic traits associated with their genome sequence. Customers can access this report by clicking on the "Reporting" option, and selecting "Traits," to view different insights on various topics such as "Appearance & Hormones," "Behavior & Perception," "Body & Athleticism," and "Nutrition & Diet."

74.     When a user enters the "Traits" webpage, an HTTP session is sent to Microsoft via Clarity sharing the customer's test results. This session includes the user's specific MUID, as well as his or her genetic information such as, for example, the user's likelihood to have a certain skin pigmentation, hair thickness, or testosterone level, as shown in the following image:



75.     Even more sensitive information regarding a user's test results and genetic predisposition to various genetic traits is conveyed when Nebula's users access the "Library" page. When a Nebula user visits the Library page and obtains a detailed report of, for example, their genetic predisposition for ADHD, the session replay transmitted to Microsoft via Clarity discloses to Microsoft the user's genetic predisposition for ADHD, as shown in the following images:

76.     As set forth above, Nebula's Library contains hundreds of reports on a wide

variety of diseases, disorders, and physical and psychological attributes, and Nebula boasts that

its Library is constantly updated and expanded "to stay up to date with the latest discoveries in human genomics and how they may relate to you."[27]

77.    Every time a Nebula user generates a report, Nebula discloses that user's genetic information to Microsoft via Clarity.

78.    Nebula programmed its website to send this information to Microsoft along with the consumer's unique MUID contained in the MUID cookie.

79.    As such, Nebula collected Plaintiff's and the Class's highly personal information and interactions on its website, and transmitted such information to Microsoft in a manner that can be tied to a website user's identity.

80.    Nebula does not disclose to its users that it sends such information to Microsoft, nor does it seek or obtain its users' consent to send such information to Microsoft. Accordingly, for every Nebula user – including Plaintiff and the Class – who has visited Nebula.org's website and used its DNA analysis services, Nebula has communicated to Microsoft that the user has undergone genetic testing, in violation of GIPA.

81.    Similarly, for every Nebula user – including Plaintiff and the Class – who has viewed Nebula reports to assess their genetic predisposition to various diseases, disorders, or physical traits, Nebula has also shared such information with Microsoft in violation of GIPA.

    D.  *Google Analytics and Tag Manager*

82.    Google touts Google Analytics as "the go-to platform for millions of website and app owners seeking to gain a deeper understanding of their website and app performance."[28] As

---

[27] https://nebula.org/blog/category/reports/ (last viewed October 2, 2024).
[28] https://developers.google.com/analytics (last viewed October 2, 2024).

described by Google, Google Analytics is "tightly integrated" with Tag Manager.[29] Google

explains the benefits of Google Tag Manager in an Introduction to Google Tag Manager video

on YouTube,[30] explaining:

> Tags on your website help you measure traffic and optimize your online
> marketing. But all that code is cumbersome to manage. It often takes too long to
> get new tags on your site or update existing ones. This can delay campaigns by
> weeks or months so you miss valuable opportunities, data, and sales. That's where
> tag management comes in. Google Tag Manager is a powerful free tool that puts
> you the marketer back in control of your digital marketing. You update all your
> tags from Google Tag Manager instead of editing the site code. This reduces
> errors, frees you from having to involve a web master, and lets you quickly
> deploy tags on your site.

83. Like the Facebook pixel and Microsoft Conversion Tracker, the Google Tag

Manager allows a company such as Nebula to install software on its website designed to collect

information about Nebula users such as Plaintiff and Class Members. And like the Facebook

pixel and Microsoft Conversion Tracker, Tag Manager also allows companies such as Nebula to

assign a Google Analytics User ID individual to each user, allowing the company to "analyze the

signed-in user experience, and understand user behavior across devices."[31]

84. Thus, Tag Manager not only shows website operators such as Nebula what users

are clicking on and looking at on their website, but it also enables the website operator to know

*who* is doing what on the website. This is because the Tag Manager utilizes each user's Google

ID to track user activity and personalize the user's experience. Google boasts that Tag Manager

allows companies such as Nebula to "set a tag to fire when a particular element is clicked – for

---

[29] https://support.google.com/tagmanager/answer/12811173?hl=en (last viewed October 2, 2024).
[30] https://www.youtube.com/watch?v=KRvbFpeZ11Y&ab_channel=GoogleAnalytics (last viewed October 2, 2024).
[31]
https://support.google.com/tagmanager/answer/4565987?hl=en&ref_topic=6333310&sjid=286139034028
7154446-NC (last viewed October 2, 2024).

example, when a user clicks the 'buy now' button or a link that leads away from your site."[32]
Companies can also set a tag to fire "based on a custom, logged event, such as a user engaging
with a widget or a custom video player on your site."[33]

85.    Google also promotes the fact that the features of Tag Manager "are fully
supported with Google Ads," as well as Google Analytics, which "helps businesses measure and
understand the customer journey."[34] Little wonder that Google describes Tag Manager as
"[d]esigned with marketers in mind."[35]

86.    All of the information collected by Google Tag Manager – including, in the case
of Nebula, a user's genetic information – is shared with Google, along with the user's unique
Google ID.

87.    As such, Nebula collected Plaintiff's and the Class's highly personal information
and interactions on its website, and transmitted such information to Google in a manner that can
be tied to a website user's identity.

88.    Specifically, once a user signs up on Nebula.org, an HTTP session is sent to
Google confirming that the customer has completed the signup process and registered a DNA
test kit, as shown in the following image:

---

[32] https://marketingplatform.google.com/about/tag-manager/features/ (last viewed October 2, 2024).
[33] *Id.*
[34] *Id.*
[35] *Id.*



89.

Nebula also discloses to Google when a customer has purchased a testing kit, as shown in the following image:



90.     Nebula does not disclose to its users that it sends such information to Google, nor does it seek or obtain its users' consent to send such information to Google. Accordingly, for every Nebula user – including Plaintiff and the Class – who has visited Nebula.org's website and used its DNA analysis services, Nebula has communicated to Google that the user has undergone genetic testing, in violation of GIPA.

91.     Similarly, for every Nebula user – including Plaintiff and the Class – who has viewed Nebula reports to assess their genetic predisposition to various diseases, disorders, or physical traits, Nebula has also shared such information with Google in violation of GIPA.

V.     **How Meta, Microsoft and Google Benefit from their Collection of Plaintiff's Genetic Data**

92.     Meta, Microsoft and Google each take in enormous amounts of money – billions of dollars annually – from selling ads on their platforms, web sites and search engines. Google alone took in nearly a quarter *trillion* dollars in advertising revenue in 2023.[36] Meta's 2023 ad revenue was over $130 billion, accounting for approximately 97% of the company's total revenue.[37] Even Microsoft, a company far more well known for its software products, brought in over $12 billion in advertising revenue in 2023.[38]

93.     In the past decade, digital ads (such as those sold by Meta, Google and Microsoft) have supplanted traditional television, radio and print advertising as the preferred choice for marketers looking to reach potential customers.

94.     The explosion in digital advertising has been driven in large part by the advertiser's ability to target those consumers who are most likely to be interested in the specific product or service being advertised, as opposed to the overly broad audience targeted by traditional ads. As Google explains to its advertising customers, "Online advertising lets you target your ads to the type of customers you want, and filter out those you don't. When you advertise online with Google Ads, you can use different targeting methods to reach potential customers right when they're searching for your products or services.""[39]

---

[36] https://www.statista.com/statistics/266249/advertising-revenue-of-google/ (last viewed October 2, 2024).

[37] https://www.statista.com/statistics/267031/facebooks-annual-revenue-by-segment/ (last viewed October 2, 2024).

[38] https://www.statista.com/statistics/725388/microsoft-corporation-ad-revenue/ (last viewed October 2, 2024).

[39] https://support.google.com/google-ads/answer/6336021?sjid=14118607410436950809-NC (last viewed October 2, 2024).

95.     Meta, Google, and Microsoft are able to achieve this granularity of the target market by compiling vast amounts of data specific to every online consumer. The core value proposition to these Defendants' advertising customers is that the advertising customers will be able to direct their ad to a consumer who is exponentially more likely to have an interest in the offered product or service than a member of the general public.

96.     While this level of granularity is valuable in its own right, it is especially so when the user's profile includes the "book of life" detailed by an individual's genetic information. When a consumer's profile contains genetic information, Meta, Microsoft and Google's advertising customers can target consumers based on the most detailed, intimate, and unique information a person possesses. Simply put, the inclusion of genetic information adds incredible value to the ads sold by Meta, Microsoft, and Google, and helps those Defendants achieve the astronomical ad revenue discussed above.

## VI.    Facts Specific to Plaintiff Portillo

97.     In or about March of 2021, Plaintiff Portillo created an account with Nebula.org, and she thereafter purchased and took a Nebula genetics test.

98.     Ms. Portillo requested a report on Nebula's analysis of her genetic test, which she then reviewed.

99.     Ms. Portillo subsequently purchased a renewal of her Nebula membership, first in July of 2021 and again in July of 2022, after which she cancelled her membership.

100.    During the period which she maintained her Nebula membership, Ms. Portillo regularly accessed the Nebula app to review various information provided by Nebula based on the results of her genetic test.

101.    Ms. Portillo regularly uses her Facebook account, and rarely (if ever) logs out of Facebook. Ms. Portillo also regularly uses Google Chrome as her web browser.

102.    Via the processes described above, when Ms. Portillo obtained and reviewed Nebula's analysis of her genetic information, Nebula shared her genetic information with Meta, Microsoft and Google. Such information included not only the fact that she had taken a genetic test, but also specific information regarding her genetic attributes.

103.    Due to the highly sensitive nature of her genetic information, together with Nebula's professed commitment to safeguarding the privacy of its customers' genetic information, Ms. Portillo believed that the information she submitted to Nebula would be kept confidential, private, and secure.

104.    Nebula never informed Ms. Portillo that her genetic information would be disclosed to anyone – let alone tech behemoths such as Meta, Microsoft and Google – when she obtained and viewed Nebula's analysis of her genetic data.

105.    Ms. Portillo never consented, agreed, or gave permission – written or otherwise – to Nebula to disclose her genetic information to any third party.

## CLASS ALLEGATIONS

106.    Plaintiff seeks certification of the class set forth herein pursuant to Federal Rule of Civil Procedure 23 ("Rule 23"). Specifically, Plaintiff seeks class certification of all claims for relief herein on behalf of a class defined as follows: All current and former Illinois residents who either obtained a DNA test from Nebula's website or who obtained an analysis from Nebula's website of a DNA test performed by another genetic testing provider, and whose genetic information was disclosed to Meta, Microsoft, or Google. Plaintiff is the proposed class representative for the Class.

107.    Plaintiff reserves the right to amend the Class definition upon completion of discovery when the contours and the parameters of the class become more apparent.

108.    Excluded from the class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parent have a controlling interest and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

109.    **Ascertainability:** The proposed Class is readily ascertainable because it is defined using objective criteria so as to allow Class Members to determine if they are part of the Class. Further, the Class can be readily identified through records maintained by Defendant.

110.    **Numerosity (Rule 23(a)(1))**: The Class is so numerous that joinder of individual members herein is impracticable. The exact number of Class Members as herein identified and described is not known, but given that Nebula holds itself out as "[t]he pioneers and leader in Whole Genome Sequencing" it is anticipated that the class will contain at least thousands of Illinois residents.

111.    **Commonality (Rule 23(a)(2)):** Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual Class members including the following:

a.    Whether Nebula discloses Plaintiff's and Class Members' genetic information to Meta;

b.   Whether Nebula obtained written consent from Plaintiff and the Class prior to disclosing their genetic information to Meta;

c.   Whether Nebula discloses Plaintiff's and Class Members' genetic information to Microsoft;

d.   Whether Nebula obtained written consent from Plaintiff and the Class prior to disclosing their genetic information to Microsoft;

e.   Whether Nebula discloses Plaintiff's and Class Members' genetic information to Google;

f.   Whether Nebula obtained written consent from Plaintiff and the Class prior to disclosing their genetic information to Google;

g.   Whether Defendant's activities and practices referenced above constitute a violation of the Illinois Genetic Information Privacy Act, 410 ILCS 513/1 *et seq.*;

h.   Whether Defendant's activities and practices referenced above unjustly enriched Meta, Microsoft and Google;

i.   Whether Plaintiff and Class Members sustained damages as a result of Defendant's activities and practices referenced above, and if so, in what amount;

j.   What constitutes appropriate injunctive relief to ensure Plaintiff's and Class Members' genetic information is not shared with third parties without their consent by Defendant.

112.   **Typicality (Rule 23(a)(3))**: Plaintiff's claims are typical of the claims of Class Members, because among other things, Plaintiff and Class Members sustained similar injuries as

a result of Defendant's uniform wrongful conduct and their claims all arise from the same events and wrongful conduct by Defendant.

113. **Adequacy (Rule 23(a)(4))**: Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests do not conflict with the interests of the Class and Class Members, and Plaintiff has retained counsel experienced in complex class action and privacy litigation to prosecute this case on behalf of the Class.

114. **Predominance & Superiority (Rule 23(b)(3))**: In addition to satisfying the prerequisites of Rule 23(a), Plaintiff satisfies the requirements for maintaining a class action under Rule 23(b)(3). Common questions of law and fact predominate over any questions affecting only individual Class Members, and a class action is superior to individual litigation and all other available methods for the fair and efficient adjudication of this controversy. The amount of damages available to Plaintiff is insufficient to make litigation addressing Defendant's conduct economically feasible in the absence of the class action procedure. Individualized litigation also presents a potential for inconsistent or contradictory judgments, and increases the delay and expense presented by the complex legal and factual issues of the case to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

115. **Final Declaratory or Injunctive Relief (23(b)(2))**: Plaintiff also satisfies the requirements for maintaining a class action under Rule 23(b)(2). Defendant has acted or refused to act on grounds that apply generally to the Class, making final declaratory and/or injunctive relief appropriate with respect to the Class as a whole.

116.    **Particular Issues (Rule 23(c)(4))**: Plaintiff also satisfies the requirements for maintaining a class action under Rule 23(c)(4). Plaintiff's claims consist of particular issues that are common to all Class members and are capable of class-wide resolution that will significantly advance the litigation.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Violation of Illinois Genetic Information Privacy Act, 410 ILCS 513/15 and 513/30

117.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

118.    Defendant Nebula is a private corporation, and thus a "person" under 410 ILCS 513/10.

119.    Plaintiff and the Class either took a DNA test from Nebula or uploaded results from a DNA test performed by another entity to Nebula. Accordingly, Plaintiff and the Class provided Defendant Nebula with "genetic test[s]" and/or the "information derived from genetic testing" with the meaning of GIPA.

120.    Defendant Nebula disclosed the fact that Plaintiff and the Class had taken a genetic test to third parties, together with Plaintiff's and Class Member's unique identifying information.

121.    Defendant Nebula did not obtain Plaintiff's or Class Members' written consent prior to disclosing to third parties the fact that Plaintiff and Class Members had taken a genetic test, together with Plaintiff's and Class Members' unique identifying information.

122.    By disclosing to third parties the fact that Plaintiff and Class Members had taken a genetic test, together with Plaintiff's and Class Members' unique identifying information,

without Plaintiff's and Class Members' consent, Defendant Nebula violated Sections 15 and 30 of GIPA.

123.    On information and belief, Defendant Nebula has knowledge of the Illinois Genetic Information Privacy Act and the protections afforded to Plaintiff's and Class Members' genetic information set forth therein. Despite such knowledge, Defendant Nebula has infringed and continues to infringe on Plaintiff's and Class Members' privacy rights as alleged herein, thereby violating GIPA. Defendant Nebula's continued violation of GIPA despite its knowledge of GIPA's requirements demonstrates that Defendant Nebula's violations of GIPA are intentional and/or reckless, or, pled in the alternative, negligent.

124.    Under GIPA, Plaintiff and Class Members are entitled to (1) an injunction requiring Defendant to cease disclosing its customers' information to third parties without written consent; (2) the greater of any award of actual damages or statutory damages of $15,000.00 per intentional and/or reckless violation, (3) the greater of any award of actual damages or statutory damages of $2,500.00 per negligent violation, and (4) an award of costs and reasonable attorneys' fees. 410 ILCS 513/40.

125.    Absent injunctive relief, Plaintiff and Class Members will suffer irreparable harm in the form of continued violations of the privacy rights embodied in GIPA, for which there is no adequate remedy at law.

126.

## SECOND CAUSE OF ACTION
### Unjust Enrichment (Against Meta, Microsoft and Google)

127.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

128.    To the detriment of Plaintiff and Class members, Meta, Microsoft and Google have been, and continue to be, unjustly enriched as a result of their wrongful conduct, as alleged herein.

129.    Without their knowledge, Plaintiff and Class Members have conferred a benefit on Meta, Microsoft and Google in that, without authorization and through inequitable means, these Defendants have collected Plaintiff's and Class Members' genetic information, the most intimate and private personal information a person possesses.

130.    Defendants Meta, Microsoft and Google appreciated, accepted and retained the benefit bestowed upon them under inequitable and unjust circumstances arising from their conduct toward Plaintiff and Class Members, as alleged herein.

131.    Specifically, the genetic information Meta, Microsoft and Google have obtained without Plaintiffs' and Class Members' consent enables those Defendants to enhance the profiles they have built for each of Plaintiff and Class Members. As alleged herein, the inclusion of Plaintiff's and Class Members' genetic information in their profiles adds tremendous value to the ads sold by Meta, Microsoft, and Google, and confers a benefit on those Defendants by enabling them to sell more ads for more money. The more information contained in the profiles allows those Defendants to promise even greater accuracy in targeting ads, thereby increasing the value of those ads to Meta, Microsoft and Google's advertising customers.

132.    Under the circumstances, it would be unjust and unfair for Meta, Microsoft and Google to be permitted to retain any of the benefits obtained from Plaintiff and Class Members in relation to Nebula's disclosure of their genetic information.

133.    Under the principles of equity and good conscience, Meta, Microsoft and Google should not be permitted to retain the genetic information belonging to Plaintiff and Class

Members, or the advertising revenue resulting from Nebula's disclosure of their genetic information, because those Defendants obtained such information through an unlawful means.

134.    Meta, Microsoft and Google should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from Nebula's unlawful disclosure of Plaintiffs' and Class Members' genetic information.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief:

1. Certify the class as defined above, appointing Antoinette Portillo as class representative, and appointing her counsel as class counsel;

2. Declare that Defendant's actions described herein constitute a violation of the Illinois Genetic Information Privacy Act;

3. Award temporary, preliminary and permanent injunctive relief prohibiting Defendant from continuing to violate the Illinois Genetic Information Privacy Act;

4. Award Plaintiff and the Class the greater of actual damages, or statutory damages of $15,000.00 for each intentional and/or reckless violation;

5. Alternatively, award Plaintiff and the Class the greater of actual damages, or statutory damages of $2,500.00 for each negligent violation;

6. Order that Defendants Meta, Microsoft and Google to destroy any information regarding Plaintiff and Class Members those Defendants have received as a result

of Nebula's unlawful disclosure of Plaintiff's and Class Members' genetic information;

7. Order that Defendants Meta, Microsoft and Google disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that those Defendants unjustly received from Nebula's unlawful disclosure of Plaintiffs' and Class Members' genetic information.

8. Award punitive damages;

9. Award Plaintiff and Class Members' their reasonable litigation expenses and attorneys' fees;

10. Award pre- and post-judgment interest at the highest rate authorized by law; and

11. Award such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues for which a jury trial is allowed.

Dated: October 10, 2024                Respectfully Submitted,

Antoinette Portillo, individually and on behalf of a Class of similarly situated individuals

By:     /s/ Thomas M. Hanson
        *One of Plaintiffs' Attorneys*

Jon Loevy
Michael I. Kanovitz
Thomas M. Hanson
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, Illinois 60607
Tel: (312) 243-5900
jon@loevy.com
mike@loevy.com
hanson@loevy.com

*Attorneys for Plaintiff and the Putative Class*

37