UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ANTOINETTE PORTILLO, individually and on behalf of a class of similarly situated individuals,

*Plaintiff*,

-against-

NEBULA GENOMICS, INC.,

*Defendant*.

Case No. 1:25-cv-12288

**DEFENDANT NEBULA GENOMICS, INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS UNDER FED. R. CIV. P. 12 (b)(1) and 12(b)(6)**

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT ........................................................................ 1**

**ALLEGATIONS OF THE COMPLAINT ...................................................... 6**

**ARGUMENT ........................................................................................................ 9**

I. DISMISSAL IS WARRANTED UNDER RULE 12(B)(1) AND 12 (B)(6) ON SEVERAL INDEPENDENT GROUNDS ...................................................................... 9

A. Legal Standard under 12(b)(6) ............................................................................. 9

B. The Parties' Contractual Choice of Massachusetts Law Compels the Exclusion of Remedies Based on Statutes of Other States, such as the Illinois GIPA. ............. 10

C. The Class Complaint Must Be Dismissed Because Plaintiff Suffered No Actionable Harm and Therefore Lacks Standing .................................................... 13

1. The Complaint Fails to Allege Plaintiff Suffered Injury from any Violation of GIPA ............................................................................................................ 14

2. The Complaint Fails to Allege that "Genetic Information" Was Transmitted by Nebula's Web Site ........................................................................................ 16

**CONCLUSION ............................................................................................... 18**

# TABLE OF AUTHORITIES

## Cases

*B.K. v. Eisenhower Medical Ctr.*,
721 F. Supp. 3d 1056 (C.D. Cal. 2024) ..................... 17
*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544, 555 (2007)..................... 9
*Boston Hides & Furs, Ltd. v. Sumitomo Bank, Ltd.*,
870 F. Supp. 1153, 1159 (D. Mass. 1994) ..................... 14
*Bushkin Associates, Inc. v. Raytheon Co.*,
393 Mass. 622, 632 (1985) ..................... 12
*Gent v. Cuna Mut. Ins. Soc'y*,
611 F.3d 79, 84 n.5 (1st Cir. 2010)..................... 12
*Haddad v. Gonzalez*,
410 Mass. 855, 867 (1991) ..................... 13
*Hodas v. Morin*,
442 Mass. 544, 549–50 (2004) ..................... 11
*In re Bank of Bos. Corp. Sec. Litig.*,
762 F. Supp. 1525, 1532 (D. Mass. 1991) ..................... 14
*In re Colonial Mortg. Bankers Corp.*,
324 F.3d 12, 15 (1st Cir. 2003)..................... 12
*Katz. v. Pershing LLC*,
672 F.3d 64, 80 (D. Mass 2012) ..................... 15
*Lambert v. Kysar*,
983 F.2d 1110, 1118 (1st Cir.1993)..................... 12
*Lussier v. Runyon*,
50 F.3d 1103, 1114 (1st Cir. 1995)..................... 12
*Martins v. 3PD, Inc.*,
No. 11-cv-11313, Dkt. No. 70 (Mar. 28, 2013)..................... 10
*Morris v. Watsco, Inc.*,
385 Mass. 672, 674, (1982) ..................... 11
*Nienaber v. Overlake Hosp. Med. Ctr.*,
733 F. Supp. 3d 1072 (W.D. Wash. 2024)..................... 16
*Ocasio-Hernández v. Fortuño-Burset*,
640 F.3d 1, 12 (1st Cir. 2011)..................... 9
*Pietrantoni v. Corcept Therapeutics Inc.*,
640 F. Supp. 3d 197, 204 (D. Mass. 2022)..................... 10, 12
*Sepúlveda-Villarini v. Dep't of Educ. of P.R.*,
628 F.3d 25, 29 (1st Cir. 2010)..................... 10
*Warth v. Seldin*,
422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975)..................... 14

## Statutes

410 ILCS 513/10..................... 3, 18
410 ILCS 513/15..................... 1

410 ILCS 513/40 ........ 1
45 C.F.R. § 160.103 ........ 18

**Other Authorities**

Restatement (Second) of Conflict of Laws s. 187 (1971) ........ 11

Defendant Nebula Genomics, Inc. ("Nebula") moves this Court to dismiss the putative Class Action Complaint ("Complaint," DKT. 1) filed by Plaintiff Antoinette Portillo ("Plaintiff"), which asserts a single claim against Nebula under the Illinois Genetic Information Privacy Act ("GIPA"), 410 ILCS 513/15;513/30; and 513/40

**PRELIMINARY STATEMENT**

This action should be dismissed because the putative class representative Plaintiff does not allege that any of her GIPA-protected "genetic information" was transmitted by Nebula to any third-party. While the pleading recites every buzzword related to online privacy and personal data, it omits the *sine qua non* of a GIPA claim: it never alleges that at least one item of GIPA-protected data regarding Plaintiff was transmitted to a third-party. There is a parade of alleged horribles that Plaintiff's class action law firm contends *could* have befallen a user of Nebula's web site as of October 2, 2024, but there is no allegation that even a single one of those hypotheticals actually occurred to anyone, never mind to Plaintiff (who alleges that she ceased using Nebula's web site in 2023).

The gravamen of Plaintiff's one-count Complaint against Nebula is that at the time of filing in 2024, Nebula's web site allegedly sent "genetic information" to Meta, Google, and/or Microsoft through those tech giants' advertising software that can run in the background on web sites depending on installation, browser choice, and circumstance. It concludes that Plaintiff's protected data was transmitted through those software conduits[1] to three tech giants, all of whom

[1] Meta's "Pixel," Google's "Analytics" and "Tag Manager," and Microsoft's "Conversion Tracking" and "Clarity."

were Defendants in this action prior to its transfer from the District Court for the Northern District of Illinois to this Court. The Chicago-based Court dismissed all three from the case.

Taking all allegations as true under Rules 12(b)(1) and 12(b)(6), the Complaint fails to state a claim against the remaining Defendant, Nebula.

*First,* and dispositively, it is conceded by all parties that Nebula Terms of Use select Massachusetts law, which preempts the use of Illinois' GIPA. Thus, this single-count Complaint against Nebula under GIPA must fail.

*Second,* even if GIPA applied (and it does not), Plaintiff has no injury in fact under GIPA, and thus no Article III standing. This Court thus lacks jurisdiction to adjudicate the dispute.

*Third*, and relatedly, Plaintiff does not allege that any of her GIPA-protected "genetic information" was transmitted by Nebula to any third-party. While the pleading recites every buzzword related to online privacy and personal data, it omits the *sine qua non* of a GIPA claim: it never alleges that at least one item of GIPA-protected data regarding Plaintiff was transmitted to a third-party. The Complaint alleges that at the time of filing in 2024, Nebula's web site allegedly sent consumer information about its users to Meta, Google, and/or Microsoft through those tech giants' advertising software[2] that can run in the background on web sites, depending on installation, browser choice, and circumstance.

The gravamen of Plaintiff's claim is that due to that consumer data transmission, "Defendant Nebula disclosed the fact that Plaintiff and the Class had taken a genetic test to third

[2] Meta's "Pixel," Google's "Analytics" and "Tag Manager," and Microsoft's "Conversion Tracking" and "Clarity."

parties, together with Plaintiff's and Class Member's unique identifying information." Compl. ¶¶ 120, 122 (Dkt. 1.) But that conclusory allegation is nowhere reflected in the facts alleged.

Instead, the Complaint alleges that Plaintiff purchased a cheek-swab test *kit* from Nebula, "took" that swab test in 2021, submitted a specimen for analysis, and reviewed her own results on Nebula's Internet web site. However, the Complaint does not allege that the occurrence of each of those 3 steps was transmitted to third parties. Rather, the only data concerning Plaintiff that the Complaint alleges was transmitted to a third-party is data reflecting the *first* step: that Plaintiff "purchased" a testing kit to potentially submit a specimen for analysis. Compl. ¶ 48 (to Meta), ¶ 58 (to Microsoft); 89 (to Google). But even if true, one does not "take a genetic test" by merely purchasing a test kit. Under GIPA, "**genetic testing** " is defined as **"[a] test or analysis of human DNA, RNA, chromosomes, proteins, metabolites, or any other biological analyte or product** that detects or identifies genotypes, mutations, or chromosomal changes." *Id.* (emphasis added throughout.) Nothing in the Complaint alleges the transmission of data stating steps 2 or 3 above—i.e., any indication such a test was conducted. At most, data was transmitted indicating that Plaintiff prepared to submit a specimen for testing, on behalf of herself or someone else. That is definitionally not a "genetic test."

Even read more broadly, the Complaint fails. GIPA (section 40) provides a remedy for Illinois users whose "genetic information" is transmitted without permission to a third-party (along with identifying information.) Per its terms, "Genetic information includes

(i) The **individual's genetic tests**;

(ii) The genetic tests of family members of the individual;

(iii) The manifestation of a disease or disorder in family members of such individual; or

(iv) Any **request for, or receipt of, genetic services**, or participation in clinical research which includes genetic

> services, by the individual or any family member of the individual"

410 ILCS 513/10.") (citing 45 C.F.R. § 160.103).(emphasis added). In turn, "**genetic services**" under subpart (iv) is defined as "(1) **A genetic test**; (2) **Genetic counseling** (including obtaining, interpreting, or assessing genetic information); or (3) Genetic education." *Id.* (emphasis added.)

The Complaint does not contain factual allegations that would reflect the transmission of any aspect of that definition of "genetic information" to Meta, Google, or Microsoft (or anyone else). There is no allegation that Nebula transmitted data reflecting that Plaintiff actually submitted a cheek swab specimen for analysis or reviewed the results on Nebula's web site, never mind any allegation that any data reflecting the genetic insights revealed by the lab analysis were ever transmitted to anyone. Those are the allegations required under GIPA, but Plaintiff cannot allege them.

Put differently, if Plaintiff never used that kit to submit a specimen, but data had been transmitted indicating that she had purchased a kit, she would plainly have no claim. Similarly, if she did submit a test but no data was transmitted reflecting that fact, she likewise has no claim. She simply was not injured within the meaning of GIPA.

*Fourth,* mindful of the reality that none of the data transmitted was "genetic information," Plaintiff embellishes the Complaint with a host of allegations regarding imagined data breaches that one of the programs—Microsoft Clarity—may have imposed upon a hypothetical user as of October 2, 2024 (the date as of which all of the allegations of concerning the operation of the web site are stated, per footnotes *passim*). Those hypotheticals required a user in late 2024 to take a specific series of steps to access sub-pages of the web site; specifically, "clicking on the 'Reporting' option, and selecting 'Traits,' to view different insights on various topics such as

'Appearance & Hormones,' 'Behavior & Perception,' 'Body & Athleticism,' and 'Nutrition & Diet.' When a user enters the 'Traits' webpage, an HTTP session is sent to Microsoft via Clarity sharing the customer's test results." Compl. ¶¶ 73-74.

But Plaintiff herself can face no such hypothetical, because she ceased using the site in 2023. Plaintiff does not allege (1) that she ever took the web-surfing steps that allegedly could cause Microsoft Clarity in 2024 to transmit data containing any results of lab analysis of a user's specimen, (2) that those steps if taken in 2021-2023 would have produced the same alleged transmission through Microsoft Clarity, nor (3) that Microsoft Clarity was even running on Nebula's web site when she used it in 2021-2023.[3]

In sum, Plaintiff alleges no facts indicating that any "genetic information" of hers was transmitted to anyone but her. The remainder of the Complaint is a hypothetical about what a Plaintiff's law firm might have been able to manipulate the 2024 version of Nebula's web site to transmit about a hypothetical user after taking the time to plumb-and-prompt every feature on the site. But no such hypothetical user is before the Court. There are no facts that allege that even a single Nebula user ever encountered the hypothetical data transmission that Plaintiffs' class action attorneys claim to have been able to manipulate the website to prompt the server to spit-out. Certainly the putative class representative Plaintiff is not alleged to have done it, and that is fatal to the pleading.

Under the Iqbal/ Twombly analysis per Rule 12(b)(6), no facts have been alleged which would violate GIPA if presumed true. The Complaint's ominous intonation that "[u]nbeknownst to its customers, Nebula shares their highly sensitive and personal genetic test results with third

[3] Plaintiff does not allege that any of the third-party software code that forms the crux of her claims was even installed on Nebula's web site at any time between her initial purchase in March 2021 and her cancellation of the service sometime in the year following her July 2022 renewal. Plaintiff admits to having no knowledge of when any of those programs were in use. Dkt. 1 ¶¶ 47, 57, 71 ("At an unknown date, Nebula installed [each code]").

parties, entirely without the customer's consent"4 is nowhere to be found in the form of factual allegations. For the reasons below, the Complaint should be dismissed with prejudice.

**ALLEGATIONS OF THE COMPLAINT**

The Complaint alleges that in March 2021, Plaintiff "created an account with Nebula.org," and then "purchased" a test kit and later "took" the test and "requested a report on Nebula's analysis of her genetic test, which she then reviewed." Dkt. 1 ¶ 97–98. Plaintiff "subsequently purchased a renewal of her Nebula membership, first in July of 2021 and again in July of 2022, after which she cancelled her membership." *Id.* ¶ 99. Thus, Plaintiff's use ended not later than 2023.

Importantly, the Complaint does not allege anywhere that Nebula transmitted to any person or entity (1) data stating that Plaintiff (or anyone else) ever actually submitted a genetic test specimen to Nebula, as opposed to simply creating an account and requesting a test kit; nor (2) data constituting the actual result(s) of any genetics test related to any person. Rather, the Complaint boils down to claims that during Plaintiff's use of the Nebula web site, it sent data to Meta, Google, or Microsoft that indicates that a user created an account, registered to take a test, and purchased a test kit to potentially submit a test.

The three alleged conduits for potential data transmission warrant individual discussion:

**Meta**: Plaintiff alleges that the "Facebook pixel" was programmed to "transmit to Meta certain information" including "information regarding consumers' purchases and registrations of genetic testing kits," and to "send this information to Meta along with the consumer's unique Facebook ID." *Id.* ¶¶ 48–49. A "Facebook ID" is also "assigned to each Facebook user and used to track user activity." *Id.* Upon signup in the Nebula web site, data is allegedly sent to Meta

[4] Dkt. 1 ¶ 3.

stating that a "customer has completed the signup process and registered a DNA test kit." *Id.* ¶ 50. If a customer later "purchase[s] a testing kit," that data is sent as well. *Id.* ¶ 51.

No other information is alleged to be sent to Meta. The Complaint does not allege that any data is sent to Meta indicating that a specimen is delivered for analysis; stating that such laboratory analysis occurred; or stating any result from such an analysis.

**Google**: The allegations are substantively identical. Plaintiff alleges that the "Tag Manager" code sends Google data "confirming that the customer has completed the signup process and registered a DNA test kit," and that it "also discloses to Google when a customer has purchased a testing kit." *Id.* ¶¶ 88–89. It also alleges that Tag Manager also allows companies such as Nebula to assign a Google Analytics User ID. *Id.* ¶¶ 82–83. As with Meta, the Complaint fails to allege any transmission of data indicating the submission of a cheek swab specimen for analysis, the occurrence of such laboratory analysis, or the results of analysis.

**Microsoft**: The allegations are again substantively identical. First, the Microsoft Conversion Tracking tool allegedly "assigns and transmits to Microsoft the user's unique Microsoft user ID ("MUID") …. a unique identifier generated by Microsoft and assigned to a specific browser to track users' activity across the internet." *Id.* ¶¶ 54-56. The Complaint alleges that when "a user sign[ed] up on Nebula.org," Conversion Tracker immediately sent data "confirming that the customer has completed the signup process and registered a DNA test kit" and then "discloses to Microsoft when a customer has purchased a testing kit." *Id.* ¶¶ 60–61.

The next paragraph somehow alleges that, "[a]ccordingly, for every Nebula user – including Plaintiff and the Class – who has visited Nebula.org's website and used its DNA analysis services, Nebula has communicated to Microsoft that the user has undergone genetic testing, in violation of GIPA." *Id.* ¶ 62. But that conclusion is nowhere in the preceding allegations: the

delivery to the customer of a kit for potential specimen preservation does not indicate that any test specimen was sent to Nebula for analysis or that such a sample has "undergone genetic testing," never mind indicating the results of such analysis. It only alleges that the kit needed to later perform such a cheek swab and delivery have been requested by the user.

The secondary Microsoft software program is "Microsoft Clarity." Plaintiff alleges that "[c]ustomers can access" on the Nebula web site a "complimentary report on different genetic traits associated with their genome sequence." *Id.* ¶ 73. Then, "[w]hen a user enters the 'Traits' webpage, an HTTP session is sent to Microsoft via Clarity sharing the customer's test results." *Id.* ¶ 74.

The Complaint then depicts a screenshot with red-outlined phrases such as: "'Below average genetic predisposition to' , 701, 670,700, [429, 27], 'class= paper-trait.'" *Id.* ¶ 75 (reprinted verbatim). The Complaint stopped the red outlining after "predisposition to" and before the string of ", 701, 670,700, [429, 27], 'class= paper-trait.'" Another red-outlined phrase amid the code is "'Very low genetic predisposition to' , 726, 685, 725, [429, 27, 1148], …"

The Complaint does not allege anywhere that *Plaintiff* "access[ed]" a "complimentary report on different genetic traits associated with their genome sequence" or "enter[ed] the Traits webpage," which the Complaint pleads would be a necessary step to prompt Clarity to transmit data to Microsoft that the user has a "genetic predisposition to 726, 685, 725, [429, 27, 1148]."

Indeed, the Complaint does not allege that *any* of the Microsoft code was installed at all during Plaintiff's use of the web site—never mind allege that the transmission capabilities laid out in the Complaint existed and were active in 2022-2023 when Plaintiff used the web site. As the Compliant puts it, "[a]t an unknown date, Nebula installed the Microsoft Clarity tracker on its

website. *Id.* at ¶ 71. But Plaintiff, again, is alleged to have ceased using the Nebula web site in 2023.

## ARGUMENT

### I. DISMISSAL IS WARRANTED UNDER RULE 12(b)(1) AND 12 (b)(6) ON SEVERAL INDEPENDENT GROUNDS

#### A. Legal Standard under 12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss, a complaint must satisfy two "hurdles." *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011). It must (1) describe the plaintiff's claims and the grounds supporting them in "sufficient detail to give the defendants fair notice" of the claims against them, *id*., citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); and (2) allege "more than mere 'labels and conclusions' or 'formulaic recitations of the cause of action.'" *Id.* quoting *Twombly*, 550 U.S. at 555. Thus, the Court is to first identify and disregard any statements in the complaint that are merely legal conclusions couched as fact. *Ocasio-Hernandez v. Furtuno-Burset*, 640 F.3d 1, 12-13 (1st Cir. 2011). Second, the Court is to determine whether, based upon all assertions that were not discarded under the first step of the inquiry, the complaint states a plausible claim for relief. *Id*. This second step is context specific and requires that the Court draw from its own judicial experience and commonsense to decide whether a plaintiff has stated a claim upon which relief may be granted or conversely whether dismissal under Rule 12(b)(6) is appropriate. *Id*. Indeed, "[t]he plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Sepúlveda-Villarini v. Dep't of Educ. of P.R.*, 628 F.3d 25, 29 (1st Cir. 2010) quoting *Twombly* at 564. On a motion to dismiss, courts "consider not only the complaint but also

matters fairly incorporated within it and matters susceptible to judicial notice." *Pietrantoni v. Corcept Therapeutics Inc.*, 640 F. Supp. 3d 197, 204 (D. Mass. 2022).

**B. The Parties' Contractual Choice of Massachusetts Law Compels the Exclusion of Remedies Based on Statutes of Other States, such as the Illinois GIPA.**

During the litigation before the Northern District of Illinois, the parties "agree[d] that the relevant provision in the Terms of Use is as follows: 'Governing Law. This Agreement shall be construed according to the laws of the State of Massachusetts….'" N.D. Ill. Order, at 4 (Neel Aff. Ex. A); *cf.* Affidavit of Tanya Zeif of Archive.org[5]at 9, 15, 21, 26, 32, 38,(annexing printouts of the content of Nebula's web site at various dates between January 1, 2021 and August 7, 2022, with each iteration containing the quoted Governing Law language.) Further, this Court sitting in diversity jurisdiction applies Massachusetts substantive law. *See Hodas v. Morin*, 442 Mass. 544, 549–50 (2004). Under Massachusetts law, Plaintiff is not permitted to make a claim under the Illinois GIPA.

In *Hodas v Morin*, , the Supreme Judicial Court enforced the parties' contractual choice of Massachusetts law to a surrogate childbearing contract even though neither party resided in Massachusetts, noting that "[a]s a rule, '[w]here the parties have expressed a specific intent as to the governing law, Massachusetts courts will uphold the parties' choice as long as the result is not contrary to public policy.'" *Id.* at 449-50; *see also Morris v. Watsco, Inc.,* 385 Mass. 672, 674, (1982) ("Massachusetts law has recognized, within reason, the right of the parties to a transaction

[5] Nebula asks the Court to take judicial notice of, and/or otherwise accept into evidence, these authenticated web page printouts of the contents of Nebula's web site on several dates during 2021 through 2022. This Court has noted that archive.org records may be subject to judicial notice in a case where, unlike here, no authenticating Affidavit was submitted. *Martins v. 3PD, Inc*., No. 11-cv-11313, Dkt. No. 70 n.8 (Mar. 28, 2013)
WL 1320454, at *16 n.8 (D. Mass. Mar. 28, 2013) (" I take judicial notice of the various historical versions of the 3PD website available on the Internet Archive at Archive.org as facts readily determinable by resort to a source whose accuracy cannot reasonably be questioned.")

to select the law governing their relationship"). *Hodas* instructs that Massachusetts looks to the Restatement (Second) of Conflict of Laws s. 187 (1971) for guidance, and applies the "two-tiered analysis" therein, which presumes that the contractual choice will control unless one of two situations arises:

> [T]he law the parties have chosen applies, unless "(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state" and is the State whose law would apply under s. 188 of the Restatement "in the absence of an effective choice of law by the parties." Restatement (Second) of Conflict of Laws, supra at s. 187(2).

*Id.* at 550. Because neither of those situations applies here, any claims in this action have to be brought under Massachusetts law, not Illinois law.

**1. <u>Massachusetts has a Substantial Relationship to the Transaction</u>**

Nebula's use of Massachusetts choice-of-law and choice-of-forum provisions in its Terms of Use is a natural outgrowth of its founding by Harvard Medical School professor Dr. George Church. *See Press Release* filed on EDGAR.GOV..[6] The company's first offices were in Boston and San Francisco. *Id.* The location of one of the parties to a contract gives the Commonwealth a substantial interest in the governance of the commercial relationship. *See Bushkin Associates, Inc. v. Raytheon Co.,* 393 Mass. 622, 632 (1985) (applying Mass. law in part based on a party's Boston principal place of business). Moreover, Massachusetts "courts routinely enforce choice-

[6] This document is submitted as Exhibit B to the Defendant's Request for Judicial Notice filed contemporaneously herewith. Matters of public record, which include material on government websites, are generally subject to judicial notice. *Pietrantoni*, 640 F. Supp. 3d at 204-05 (Court took judicial notice of government records available on FDA website), citing *In re Colonial Mortg. Bankers Corp.*, 324 F.3d 12, 15 (1st Cir. 2003); *Gent v. Cuna Mut. Ins. Soc'y*, 611 F.3d 79, 84 n.5 (1st Cir. 2010). *See also Lussier v. Runyon*, 50 F.3d 1103, 1114 (1st Cir. 1995) (government documents may be subject to judicial notice, "on the ground that information contained therein is 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.' ")

of-law provisions unless the law chosen violates established public policy or bears no reasonable relationship to the contractual transaction" *Lambert v. Kysar,* 983 F.2d 1110, 1118 (1st Cir.1993). There is no credible argument that Massachusetts lacks a substantial relationship to this dispute.

**2. Illinois Does Not Have a "Materially Greater Interest" in This Matter Than Massachusetts, and Massachusetts Law is Not Contrary to Any Fundamental Policy Of Illinois**

Massachusetts has its own robust framework for protecting genetic information and privacy. M.G.L. c. 111, § 70G directly addresses unauthorized disclosure of genetic information, prohibiting it without written consent and designating violations as unfair or deceptive acts under M.G.L. c. 93A, § 2, with remedies including damages and attorney's fees. In cases where the § 70G violation is deemed "willful or knowing" (e.g., intentional disclosure), Chapter 93A, § 9(3) allows double or treble damages, applied to either actual damages or the $25 statutory minimum. *See Haddad v. Gonzalez*, 410 Mass. 855, 867 (1991).

Chapter 93A broadens relief for unfair practices. These statutes reflect Massachusetts' balanced approach to genetic privacy, providing adequate protection without the need for GIPA's strict liability and statutory damages. While the plaintiff's Illinois residency might suggest an interest in applying GIPA, Illinois' public policy is not so fundamental as to override the contract, especially since Massachusetts' laws offer comparable remedies.

These laws reflect the Commonwealth's approach to balancing privacy rights with commercial realities in the same manner that Illinois does with GIPA. "[W]here there is a 'false conflict' such that the 'laws of both states relevant to the set of facts are the same …. there is no real conflict between them.' …. In such a case, the 'case ought to be decided under the law that is common to

both states.'" *Boston Hides & Furs, Ltd. v. Sumitomo Bank, Ltd.*, 870 F. Supp. 1153, 1159 (D. Mass. 1994) (citation omitted).

### C. The Class Complaint Must Be Dismissed Because Plaintiff Suffered No Actionable Harm and Therefore Lacks Standing

Because Article III of the Constitution limits the jurisdiction of federal courts, "[S]tanding is the threshold issue in every federal case,' because the resolution of the standing issue bears directly on the constitutional power of this Court to decide the controversy at all." *In re Bank of Bos. Corp. Sec. Litig.*, 762 F. Supp. 1525, 1532 (D. Mass. 1991) citing Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). In a class action, "[a] court must assess standing to sue based upon the standing of the named plaintiff and not upon the standing of unidentified class members." *Adair v. Sorenson*, 134 F.R.D. 13 , 16 (Feb 7, 1991) citing *Warth,* 422 U.S. at 502.

If the putative class plaintiff does not allege an actionable injury, the Complaint must fail for lack of standing. *See id.* ("Mr. Adair's standing, therefore, must be based upon the injury suffered by Mr. Adair, not any injury suffered by unidentified class members, and the Court must limit the claim accordingly."); *see also* Warth, 422 U.S. at 498, (observing that in class actions, "the standing requirement properly ensures that the court's remedial powers are invoked, not for the resolution of abstract public controversies, but for the protection of individual rights.")

This Complaint must be dismissed because, as set forth below, the putative class representative Plaintiff has not alleged any actionable injury under GIPA. "A plaintiff must allege that he has been or will in fact be perceptibly harmed ..., not that he can imagine circumstances in which he could be affected." *Katz. v. Pershing LLC,* 672 F.3d 64, 80 (D. Mass 2012)(dismissing class complaint where putative plaintiff had no injury: "the irreducible minimum requirements of

pleading and Article III doom her case.") None of Plaintiff's "genetic information" is alleged to have been transmitted to any third party.

1. The Complaint Fails to Allege Plaintiff Suffered Injury from any Violation of GIPA

Even if GIPA applied, Plaintiff suffered no alleged injury actionable under GIPA. The Meta/Google/Microsoft programs at issue constitute the only alleged conduits for the improper transfer of data. However, the Complaint does not even attempt to allege that any of them were installed or active during her use of Nebula's website in 2021, 2022, and potentially part of 2023. To the contrary, she alleges that each was installed "[a]t an unknown date." Dkt. 1 ¶ 71.

Even if the Court assumes that each of those software programs was active during Plaintiff's use, Plaintiff does not allege what the functionality of the web site or the third-party software was when she used the site. Instead, the Complaint alleges only that the software programs were active on Nebula's website as of "October 2, 2024," a date repeatedly referred in the Complaint's footnotes as the "last viewed" date of the site.

The entirety of Plaintiff's allegations as to her use of Nebula's services is that in 2021, she requested a test, took it, reviewed the results, and cancelled the service. The Complaint discusses at length the alleged functionality of the site today, but does not purport to describe what it was in 2021 to 2023. And Plaintiff admits to not having used the web site for several years.

When a plaintiff "provides no additional factual information *tying her actual activities to the allegations made by the hypothetical* purportedly demonstrating disclosure of Private Information," dismissal must result. *Nienaber v. Overlake Hosp. Med. Ctr.*, 733 F. Supp. 3d 1072, 1083–84 (W.D. Wash. 2024).\ In *Nienaber*, the Western District of Washington dismissed a putative class action complaint that alleged "that Defendant installed and implemented … Facebook Tracking Pixel ("Pixel") and Conversions Application Programming

Interface ("Conversions API"), as well as the Google Tag Manager tool-on 'its Website,' which 'secretly enabled' the unauthorized transmission and disclosure of information." The Court dismissed the complaint because:

> Plaintiff makes no allegations …. that Defendant transmitted Private Information *of hers* to third parties through the Private Patient Portal. …. *Instead, the Complaint discusses a hypothetical example* of a patient scheduling an appointment where the user is then directed to communicate information including the type of medicine being sought and the type of appointment being scheduled. Id. ¶ 90. *But Plaintiff neither alleges that she tried* to schedule an appointment through MyChart *nor that she entered the type of medicine she sought or the type of appointment being scheduled* (which would undoubtedly be protected health information), or that the Pixel transmitted her information to Facebook. *All of these types of information are easily and clearly within Plaintiff's control, and Plaintiff cannot maintain her theory of the case as to the MyChart website absent concrete factual allegations that her Private Information entered on Defendant's Private Patient Portal was disclosed.*

*Id.* at 1083 (pleading citations omitted) (emphasis added). Similarly, the Central District of California dismissed a privacy-violation complaint in which:

> …. Plaintiffs' Complaint is 90 pages long but includes less than four pages of vague allegations about Plaintiffs and their experiences with Defendant. The Complaint is replete with conjectures and hypothetical scenarios and patients. *Plaintiffs fail to allege any specificity as to what medical information was allegedly disclosed or when it was disclosed.* B.K. states she started using the Website over three years ago and started receiving unsolicited ads "shortly after" but *provides no more information about the alleged disclosures.* N.Z. alleges the same pattern but states that it occurred "over seven years ago."

*B.K. v. Eisenhower Medical Ctr.,* 721 F. Supp. 3d 1056, 1064 (C.D. Cal. 2024)) (internal citations omitted).

Here, Plaintiff's allegations are every bit as hypothetical and avoidant as in *Nienaber* and *B.K.* Nowhere does Plaintiff allege what data *of hers* was allegedly transmitted, nor even that the

pertinent code of the co-Defendants was installed when she accessed Nebula's website. Instead, Plaintiff alleges what hypothetically might happen if a user on October 2, 2024 or later (1) created an account, (2) registered for a test, and (3) purchased a test kit for potential use. Because Plaintiff has made no allegation that data concerning her genetics test was transmitted to anyone, she has stated no claim under GIPA.

2. The Complaint Fails to Allege that "Genetic Information" Was Transmitted by Nebula's Web Site

Even if the Court interprets the Complaint to allege that the Plaintiff had alleged some transmission of data related to her use of Nebula's service, Plaintiff's claim would fail because none of the data that could have been transmitted could constitute "genetic information" protected by GIPA. *See* 410 ILCS 513/10; ("[G]enetic information includes (i) The individual's genetic tests; (ii) The genetic tests of family members of the individual; (iii) The manifestation of a disease or disorder in family members of such individual; or (iv) Any request for, or receipt of, genetic services, or participation in clinical research which includes genetic services, by the individual or any family member of the individual (citing 45 C.F.R. § 160.103). "Genetic services" is defined as "(1) A genetic test; (2) Genetic counseling (including obtaining, interpreting, or assessing genetic information); or (3) Genetic education." *Id.* And "genetic testing " is defined as "[a] test or analysis of human DNA, RNA, chromosomes, proteins, metabolites, or any other biological analyte or product that detects or identifies genotypes, mutations, or chromosomal changes."

The Complaint alleges only that Plaintiff (1) created an account, (2) registered for a test, (3) purchased a test kit, and (4) "took" a test and reviewed results from Nebula. But even if the Complaint is read as if Plaintiff had used the web site today (as opposed to years ago), only items (1) to (3) above are alleged to have been transmitted . She is not alleged to have taken any action that would result in the transfer of the results of her test to any third-party, because none of the

code at issue is alleged to be capable of transmitting Plaintiff's "genetic information." Meta Pixel is alleged only to transmit data indicating that a "customer has completed the signup process and registered a DNA test kit" and "purchased a testing kit." Dkt. 1 ¶¶ 50-51. Similarly, Google's Tag Manager is alleged only to be capable of transmitting that "the customer has completed the signup process and registered a DNA test kit," and that "a customer has purchased a testing kit." *Id.* ¶¶ 88–89. Plaintiff alleges that Microsoft's Clarity and Conversion Tracker are currently capable of transmitting phrases concerning unidentified "propensities" when the user takes several detailed steps within jump-pages on Nebula's web site—but *the Complaint does not allege that Plaintiff took any of those additional steps*, such as using the "Traits" feature. Indeed, Plaintiff does not allege that the Traits feature existed in 2021-2023 when she used the service. She's uninjured by this hypothetical.

At most, the Complaint alleges that if, in 2021 to 2023, she had used Nebula's web site as it is programmed today, it could have transmitted data to third parties indicating that she created an account and purchased a swab test kit. But merely creating an account and purchasing a swab test kit for potential use is not "request[ing] a genetic test" within the meaning of GIPA, and therefore is not "genetic information." For example, if an account is created and a kit is requested—but never used to submit a specimen—no "genetic services" have been sought within the meaning of GIPA, and no claim lies. Because Plaintiff has not alleged any facts that constitute the transmission of her "genetic information," the claim under GIPA must fail. Notably, her claim is not saved by the allegations concerning Microsoft Clarity and the "Traits" sub-page, because she does not claim to have taken any of the actions that allegedly cause the transmission of specific

test result data to Microsoft, and thus has no injury-in-fact arising from that hypothetical occurrence.

In sum, Plaintiff does not state a claim under GIPA for herself and therefore lacks standing to pursue any claims on behalf of a putative class, and also fails to state a claim on which relief can be granted. The Complaint should be dismissed.

## CONCLUSION

For the foregoing reasons, Nebula respectfully requests that this Court dismiss the Complaint for failure to state a claim, with prejudice, along with such other and further relief as the Court deems just, proper, and equitable.

Respectfully submitted,

NEBULA GENOMICS, INC.,

By its attorneys,

/s/ Thomas E. Lent
Thomas E. Lent, BBO # 644970
BARROW LENT LLP
98 N. Washington St., Suite 230
Boston, Massachusetts 02114
(617) 830-5463
tlent@marbarlaw.com

Dated: November 17, 2025

- and –

/s/ Wallace Neel
Wallace Neel (Admitted *Pro Hac Vice*)
WALLACE NEEL PLLC
One Blue Hill Plaza, LL Suite 1509
Pearl River, NY 10965

**CERTIFICATE OF SERVICE**

Pursuant to Local Rules 5.2(b)(2) and 5.4 of the Local Rules of the United States District Court for the District of Massachusetts, I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and that paper copies will be sent by first-class mail to those indicated as non-registered participants, if any, on November 17, 2025.

*/s/ Thomas E. Lent*
Thomas E. Lent