IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

ANTOINETTE PORTILLO, individually
and on behalf of a class of similarly situated
individuals,

        *Plaintiff,*

        v.

NEBULA GENOMICS, INC.,

        *Defendants*.

)
)
)
)
)
)
)
)
)
)
)
)

Case No. 1:25-cv-12288-BEM

Hon. Brian E. Murphy, District Judge

**JURY TRIAL DEMANDED**

Leave to file granted on
December 16, 2025

<u>**PLAINTIFF'S RESPONSE TO DEFENDANT NEBULA GENOMICS, INC.'S MOTION
TO DISMISS**</u>

## I.    INTRODUCTION

Defendant Nebula Genomics, Inc.'s Motion to Dismiss ignores settled law and ignores

the well-pled allegations of Plaintiff's Complaint. Nebula's primary argument – that Plaintiff's

claim under the Illinois Genetic Information Privacy Act ("GIPA") is barred because of a

Massachusetts choice-of-law provision – runs afoul of standard choice-of-law analysis, and not

surprisingly has been routinely rejected by federal courts in analogous contexts. Nebula's

alternative bases for dismissal fare no better. The Complaint lays out, in detail, how Nebula

shares genetic information with Meta, Google, and Microsoft. And despite Nebula's baseless

arguments to the contrary, the Complaint alleges repeatedly that Plaintiff's genetic information,

like all Class Members, was transmitted by Nebula to each technology behemoth, along with

Plaintiff's identifying information. Finally, the United States Supreme Court has held that a

violation privacy rights such as those protected by GIPA is a sufficiently concrete injury to

establish Article III standing. For these reasons, and those set forth more fully below, Nebula's

motion should be denied in its entirety.

## II.    BACKGROUND

For purposes of this motion to dismiss, the following factual allegations of the Complaint

are taken as true. *See Gould v. Bank of New York Mellon*, 123 F. Supp. 3d 197, 199 (D. Mass.

2015).

Nebula is a commercial genetics company that offers genetic testing and analysis. Dkt. 1,

¶ 27. Nebula offers DNA tests, and also offers DNA analysis for customers who have taken a

DNA test offered by another genetic testing company. Dkt. 1, ¶ 28. Nebula tells its customers

and potential customers that its DNA analysis provides 50 times more information than the

original raw data file from other DNA testing services, offering its customers personalized

reports on hundreds of topics such as predisposition to disease, physical characteristics, and the

impact of genetics on personality. Dkt. 1, ¶ 29. As Nebula itself acknowledges, genetic

information can be used for malicious ends by bad actors, such as authoritarian governments

seeking to "discriminate against or prosecute groups of people." Dkt. 1, ¶ 31.

To protect the highly confidential genetic information of Illinois residents, in 1998 the

Illinois Legislature enacted the Genetic Information Privacy Act ("GIPA"), 410 ILCS 513/1 *et*

*seq.* In doing so, the Legislature recognized that "[t]he public health will be served by facilitating

voluntary and *confidential* nondiscriminatory use of genetic testing information." 410 ILCS

513/5 (emphasis added). In short, GIPA simply says that the results of a DNA or genetic test – or

whether an individual has taken a genetic test at all – is confidential, and that the person who had

that test is the only one that is entitled to the results. No one else can even know that the

individual has taken a genetic test without that person's knowledge or permission.  Dkt. 1, ¶ 22.

To achieve this goal, GIPA proscribes any "person"[1] from, among other things, disclosing genetic testing and information derived from genetic testing to any person other than the individual tested or to persons specifically authorized in writing in accordance with GIPA. *See* 410 ILCS 513/15(a) & 513/30(a). Furthermore, GIPA also makes it unlawful to disclose to a third party even the fact that an individual has undergone any genetic testing at all. 410 ILCS 513/30 (a).

Despite the clear requirements of GIPA, Nebula shares its customers' genetic information with third parties, specifically Meta, Google, and Microsoft. Dkt. 1, ¶ 32. Nebula does so because it has installed and enabled analytics and advertising tools on its website, specifically the Facebook Pixel, Microsoft Conversion Tracking, Microsoft Clarity, and Google Analytics and Tag Manager. *Id.* Each of these analytics tools uses "cookies" that are installed on the user's device, which track a website user's activities as she browses the website. Among the information provided to Meta, Google and Microsoft from Nebula's website via these cookies is Nebula users' genetic information. Specifically, as alleged in the Complaint:

*Facebook Pixel*

- Nebula programmed the Facebook pixel to collect and transmit to Meta information regarding consumers' purchases and registrations of genetic testing kits. Dkt. 1, ¶ 48.

- Nebula programmed its website to send this information to Meta along with the consumer's unique Facebook ID. Dkt. 1, ¶ 49.

- A consumer's unique Facebook ID can be used to identify the consumer, and accordingly constitutes personally identifiable information ("PII"). Dkt. 1, ¶¶35-36.

---

[1] As discussed below, GIPA's application to any "person" makes it much broader than Massachusetts' statutory protection of genetic information, which applies only to health care facilities. M.G.L. ch. 111, § 70G(c).

- Accordingly, for every Nebula user with Facebook accounts – *including Plaintiff* – Nebula has communicated to Meta that the user had undergone genetic testing, in violation of GIPA. Dkt. 1, ¶ 52.

*Microsoft Conversion Tracking*

- Nebula programmed Microsoft's Conversion Tracking to collect and transmit to Microsoft information regarding consumers' purchases and registrations of genetic testing kits. Dkt. 1, ¶ 58.

- Nebula programmed its website to send this information to Microsoft along with the consumer's unique Microsoft User ID ("MUID"). Dkt. 1, ¶ 59.

- A consumer's unique MUID can be used to identify the consumer, and accordingly constitutes PII. Dkt. 1, ¶¶ 55-56.

- Accordingly, for every Nebula user – *including Plaintiff* – who has visited Nebula.org's website and used its DNA analysis services, Nebula has communicated to Microsoft that the user has undergone genetic testing, in violation of GIPA. Dkt. 1, ¶ 62.

*Microsoft Clarity*

- Nebula programmed Microsoft Clarity to collect and transmit to Microsoft information regarding consumers' purchases and registrations of genetic testing kits as well as information regarding the specific results and analysis of their genetic tests. Dkt. 1, ¶ 72.

- Moreover, every time a Nebula user generates a report on a disease, disorder, or physical or psychological attribute from Nebula's library, Nebula discloses that user's genetic information to Microsoft via the Microsoft Clarity tracker. Dkt. 1, ¶ 77.

- Nebula transmits this information to Microsoft with the consumer's unique MUID which, as set forth above, constitutes PII. Dkt. 1, ¶ 78.

- Accordingly, for every Nebula user – *including Plaintiff* – who has visited Nebula.org's website and used its DNA analysis services, Nebula has communicated to Microsoft via Microsoft Clarity that the user has undergone genetic testing, in violation of GIPA. Dkt. 1, ¶ 80.

- Similarly, for every Nebula user – *including Plaintiff* – who has viewed Nebula reports to assess their genetic predisposition to various diseases, disorders, or physical traits, Nebula has also shared such information with Microsoft via Microsoft Clarity in violation of GIPA. Dkt. 1, ¶ 81.

*Google Analytics and Tag Manager*

- Nebula also utilizes Google Tag Manager to share a user's genetic information with Google. Dkt. 1, ¶ 86.

- Tag Manager, like the Facebook pixel and Microsoft Conversion Tracking and Clarity, utilizes a unique Google ID to allow the company to "analyze the signed-in user experience, and understand user behavior across devices." Dkt. 1, ¶ 83.

- Accordingly, for every Nebula user – *including Plaintiff* – who has visited Nebula.org's website and used its DNA analysis services, Nebula has communicated to Google that the user has undergone genetic testing, in violation of GIPA. Dkt. 1, ¶ 90.

- Similarly, for every Nebula user – *including Plaintiff* – who has viewed Nebula reports to assess their genetic predisposition to various diseases, disorder, or physical traits, Nebula has also shared such information with Google in violation of GIPA. Dkt. 1, ¶ 91.

Plaintiff Portillo was a Nebula user from March of 2021 until her subscription expired in July of 2023. Dkt. 1, ¶¶ 97-99. During that time period, she requested a report on Nebula's analysis of her genetics test, and also regularly accessed the Nebula app to review various information provided by Nebula based on the results of her genetic test. Dkt. 1, ¶¶ 98 & 100. Via the processes described above, when Ms. Portillo obtained and reviewed Nebula's analysis of her genetic information, Nebula shared her genetic information with Meta, Microsoft and Google. Dkt. 1, ¶ 102. Such information included not only the fact that she had taken a genetic test, but also specific information regarding her genetic attributes. *Id.*

Ms. Portillo believed that the information she submitted to Nebula would be kept confidential, private, and secure. Dkt. 1, ¶ 103. Nebula never informed Ms. Portillo that her genetic information would be disclosed to anyone – let alone tech behemoths such as Meta, Microsoft and Google – when she obtained and viewed Nebula's analysis of her genetic data. Dkt. 1, ¶ 105. Ms. Portillo never consented, agreed, or gave permission – written or otherwise – to Nebula to disclose her genetic information to any third party. Dkt. 1, ¶ 105.

### III.    DISCUSSION

#### A. <u>The Choice-of-Law Clause is Unenforceable</u>

As Defendant's own cited case acknowledges, a choice of law clause is unenforceable under Massachusetts law if its application is "contrary to public policy." *Hodas v. Morin*, 814 N.E.2d 320, 325 (Mass. 2004). To make this determination, Massachusetts courts follow the two-tiered analysis set forth in the Restatement (Second) of Conflict of Laws § 187(2), and "will not honor the parties' choice of law where '(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) [where] application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state [in the determination of the particular issue]' and is the State whose law would apply ... 'in the absence of an effective choice of law by the parties.'" *Oxford Global Resources, LLC v. Hernandez*, 106 N.E. 556, 564 (Mass. 2018) (citations omitted).

Here, Nebula's Massachusetts choice-of-law clause (the "Clause") is unenforceable under the "second prong" of the Restatement test because: (1) application of Massachusetts law affords no protection to privacy interests of Illinois residents whose genetic information is shared with third parties by genetics testing companies like Nebula and would, thus, violate Illinois's fundamental policy set forth in GIPA; (2) Illinois has a materially greater interest than Massachusetts in the determination of the claims of Illinois residents like Plaintiff regarding their genetic data; and (3) Illinois law would otherwise apply here.

#### 1.    *Application of Massachusetts Law Here Conflicts with Fundamental Illinois Policy*

In enacting GIPA, the Illinois legislature took pains to detail the strong public policy the statute is meant to address:

§ 5.    Legislative findings; intent. The General Assembly finds that:

(1)    The use of genetic testing can be valuable to an individual.

(2)    Despite existing laws, regulations, and professional standards which require or promote voluntary and confidential use of genetic testing information, many members of the public are deterred from seeking genetic testing because of fear that test results will be disclosed without consent in a manner not permitted by law or will be used in a discriminatory manner.

(3)    The public health will be served by facilitating voluntary and confidential nondiscriminatory use of genetic testing information. …

410 ILCS 513/5.

Simply put, the Illinois legislature enacted GIPA to serve the state's interest in public health by giving Illinois residents assurance that they could engage with genetic testing companies like Nebula without fear of their genetic information being compromised. Enforcement of Nebula's clause here would write out of existence Illinois' fundamental policy expressed in GIPA of protecting its citizens' privacy interests in their genetic information.

Defendant appears to recognize that this is fatal to its argument, contending that an Illinois resident such as Plaintiff could simply sue under Massachusetts' statutory prohibition on unauthorized disclosure of protected information, codified at M.C.L. ch. 111, § 70G. Defendant's argument proves too much. By its terms, Section 70G applies only to disclosure by a "facility, … physician or health care provider." M.C.L. ch. 111, § 70G(c). "Facility" is defined by reference to M.C.L. ch. 111, § 70E, entitled "Patients' and residents' rights," which makes clear that "facility" means hospitals, nursing homes, treatments centers, and the like. Thus, if Massachusetts law applies, an Illinois resident such as Ms. Portillo has no recourse despite the Illinois legislature's clear intention to provide her a remedy for Nebula's conduct.[2]

---

[2] Even if Nebula were subject to Section 70G, Defendant's contention that Massachusetts law offers "comparable remedies" to those deemed appropriate by the Illinois legislature is meritless. Section 70G imposes a pre-suit demand and response process that makes it highly unlikely that

For these reasons, courts have routinely rejected similar choice-of-law arguments in analogous contexts. In addition to the genetic information protected under GIPA, the Illinois legislature has also enacted a unique statute protecting Illinois residents' biometric information, the Biometric Information Privacy Act, 740 ILCS 14/1 *et seq.* ("BIPA"). As BIPA has been heavily litigated throughout the country over the past ten years, defendants have routinely made the same argument advanced by Nebula here; namely, that a non-Illinois choice-of-law provision in a website's terms of use precludes application of BIPA. Every court to have addressed the argument has rejected it. *See, e.g., Delgado v. Meta Platforms, Inc.*, 718 F. Supp. 3d 1146, 1152-55 (N.D. Cal. 2024) (applying Restatement section 187 two-tier test to determine California choice-of-law clause unenforceable); *Patterson v. Respondus, Inc.*, 593 F. Supp. 3d 783, 811-13 (N.D. Ill. 2022) (same, Washington choice-of-law clause); *Hogan v. Amazon.com, Inc.*, 2022 WL 952763, at *4 (N.D. Ill. Mar. 30, 2022) (same); *In re Facebook Biometric Information Privacy Litig.*, 185 F. Supp. 3d 1155, 1169-70 (N.D. Cal. 2016) (same, California choice-of-law clause).

Just as the *In re Facebook* court said of BIPA, "[t]here can be no reasonable doubt that the Illinois [Genetic] Information Privacy Act embodies a fundamental policy of the state of Illinois. … By its express terms, [GIPA] manifests Illinois' substantial policy of protecting its citizens' right to privacy in their personal [genetic] data. [¶] It is equally undeniable that enforcing the contractual choice of [Massachusetts] law would be contrary to this policy in the starkest way possible." *In re Facebook*, 185 F. Supp. 3d at 1169. Moreover, "[t]he conflict is all the more pronounced because [Massachusetts] has no law or policy equivalent to [GIPA]." *Id.*

---

any plaintiff would recover more than $75.00, or treble the $25.00 in statutory damages. Recognizing the importance of protecting Illinois residents' genetic information, the Illinois legislature authorizes statutory damages of $2,500.00 for negligent violations, and $15,000.00 for intentional or reckless violations.

These cases are directly in line with cases like *Oxford*, in which the Massachusetts Supreme Judicial Court held that a Massachusetts choice-of-law provision was unenforceable because it violated California's "settled legislative policy in favor of open competition and employee mobility." 106 N.E.3d at 564-65; *see also Fine v. Guardian Life Ins. Co. of Am.*, 450 F. Supp. 3d 20, 31 (finding New York choice-of-law clause unenforceable because it was contrary to public policy expressed in Massachusetts Wage Act).

Defendant's cited cases, in contrast, are wholly inapposite. While *Hodas* accurately states the test by which a choice-of-law provision is analyzed, the parties were all seeking enforcement of the Massachusetts choice-of-law clause because the parties wanted Massachusetts' policy in favor of surrogacy to apply. *Morris v. Watsco, Inc.*, 433 N.E.2d 886, 888-89 (Mass. 1982), is similarly unhelpful. The question in that case was whether Massachusetts or Florida law relating to prejudgment interest should apply, and the court undertook no analysis of any public policy considerations, much less either state's respective interest in application of its law to the dispute other than to suggest that Massachusetts' law was outdated. How the court's ruling relates to this case is unstated by Defendant.

Simply put, application of Massachusetts law would leave Plaintiff with no redress, completely frustrating Illinois' fundamental public policy in favor of protecting her genetic information.

### 2. Illinois has a Materially Greater Interest in the Outcome of this Case

In identifying the state with the most significant relationship to the transaction and the parties under Massachusetts law, courts evaluate: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of

business of the parties." *Oxford*, 106 N.E.3d at 563 (quoting *Bushkin Assocs., Inc. v. Raytheon Co.*, 473 N.E.2d 662, 669 (Mass. 1985)).

As in *In re Facebook*, "Illinois' greater interest in the outcome of this [GIPA] dispute is also readily apparent." 185 F. Supp. 3d at 1170. Plaintiff is a resident of Illinois, and she used the Nebula service at issue in Illinois. Any relevant "contract" would have been executed by Plaintiff in Illinois. And there can be little question but that Illinois has a greater interest than does Massachusetts in protecting the genetic information of Illinois residents.

Defendant's only counter is to suggest that Massachusetts, in enacting a genetic information protection statute that is limited to health care providers and facilities, has somehow sought "balance" by "providing adequate protection without the need for FIPA's strict liability and statutory damages." Dkt. 98 at 12. This argument fails for multiple reasons. First, Nebula cites no statutory language or legislative history suggesting that the Massachusetts legislature was concerned with achieving some sort of "balance;" to the contrary, the statute is focused on the rights of patients and residents at health care facilities, not on residents interested in genetic testing. Even more fundamentally, as discussed above, the Massachusetts law provides no protection for Illinois residents subject to Nebula's invasive and privacy-violating conduct; thus, to the extent the Massachusetts legislature was attempting to achieve some sort of balance it utterly failed to do so. As recognized by the Supreme Judicial Court in *Oxford*, the absence of a "comparable legislative policy" in Massachusetts is further indication that Massachusetts' interest in this suit is less than that of Illinois. 106 N.E.3d at 565.

The reality is, while states have substantial, case-specific interests in protecting their residents from losing statutory protections, *Bridge Fund Cap. Corp. v. Fastbucks Franchise Corp.*, 622 F.3d 996, 1005 (9th Cir. 2010), a state's interest in applying its law to residents of

10

foreign state "is attenuated." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 594 (9th Cir. 2012).

Stated simply, Illinois has a strong interest in protecting its residents' genetic information.

Massachusetts, unsurprisingly, has no interest in protecting the genetic information of residents

of another state.

### 3. *Illinois Law Would Apply in the Absence of an Enforceable Choice-of-Law Clause*

Absent a choice-of-law clause, "the rights of the parties would be 'determined by the

local law of the state which, with respect to that issue, has the most significant relationship to the

transaction and the parties.'" *Oxford*, 106 N.E.3d at 563 (quoting *Bushkin Assocs., Inc. v.

Raytheon Co.*, 473 N.E.2d 662 (Mass. 1985). For the reasons set forth above, Illinois' strong

public policy in protecting the genetic information of residents such as Plaintiff is clearly more

significant than Massachusetts' interests.

For each of the reasons set forth above, the Nebula choice-of-law clause violates public

policy; as such it is unenforceable.

### B. <u>Plaintiffs Allegations Plausibly Allege Injury and Defendant's Violation of GIPA</u>

### 1. *Legal Standard*

When ruling on a motion to dismiss for failure to state a claim, a court must accept the

complaint's well-pled factual allegations as true and draw all reasonable inferences in the

plaintiff's favor. *Potugues-Santana v. Rekomdiv Int'l Inc.*, 725 F.3d 17, 25 (1st Cir. 2013). The

Federal Rules do not require "detailed factual allegations," and a complaint needs only to

"plead[] factual content that allows the court to draw the reasonable inference that the defendant

is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678(2009). The pleading

must describe the claim in enough detail to give the defendant notice of the claim and the

grounds on which it rests. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007), citing

*Conley v. Gibson*, 355 U.S. 41, 47 (1957). The allegations need only plausibly suggest the possibility of a right to relief above the "speculative level." *Id.*

### 2. The Complaint Contains Detailed Factual Allegations Establishing Nebula's Disclosure of Plaintiff's Genetic Information

Nebula's Rule 12(b)(6) argue hinges on its contention that the Complaint describes only a hypothetical scenario of Nebula's sharing of genetic information without tying Plaintiff's activities to the hypothetical. Dkt. 98, at 14-16. To the contrary, Nebula's practices as alleged in the Complaint are not hypothetical, but rather a highly detailed explanation – complete with screen shots – of Nebula's installation of various cookies and trackers that transmit genetic information to Meta, Microsoft and Google. *See, generally,* Dkt. 1, ¶¶ 30-91. Specifically, the Complaint details how Nebula's use of cookies and trackers transmits the genetic information of users who have purchased, registered, and uploaded test kits and reviewed analyses and reports relating to their genetic testing. *Id.* Throughout these detailed allegations, the Complaint makes clear that Nebula engaged in these privacy-violating practices with respect to Plaintiff *and* putative class members. *See, e.g.*, Dkt. 1 ¶¶ 52, 62, 73, 79, 80, 81, 83, 87, 90, 91.

These allegations alone are sufficient to state a claim against Nebula for its violation of GIPA. The Complaint goes even further, however, tying Plaintiff's use of Nebula directly to the processes by which Nebula illegally discloses the genetic information of all its users. The Complaint alleges that Plaintiff: "purchased and took a Nebula genetics test," Dkt. 1, ¶ 97; "requested a report on Nebula's analysis of her genetic test, which she then reviewed," Dkt. 1, 98; and "regularly accessed the Nebula app to review various information provided by Nebula based on the results of her genetic test." Dkt. 1, ¶ 100. Finally, the Complaint expressly links Plaintiff's activities with the processes described earlier, alleging that "[v]ia the processes described above, when Ms. Portillo obtained and reviewed Nebula's analysis of her genetic

information, Nebula shared her genetic information with Meta, Microsoft and Google. Such information included not only the fact that she had taken a genetic test, but also specific information regarding her genetic attributes." Dkt. 1, ¶ 102.

These detailed factual allegations are wholly distinguishable from those in Nebula's cited cases. As Nebula concedes, in *Nienaber v. Overlake Hosp. Med. Ctr.*, 733 F. Supp. 3d 1072 (W.D. Wash. 2024), the complaint did not allege that the plaintiff had engaged in the activities triggering the allegedly violative information sharing through the Facebook pixel. *Id.* at 1083. Here, in sharp contrast, Plaintiff expressly alleges that she did engage in the activities triggering the sharing of information via the Facebook pixel (as well as the other cookies and trackers), by purchasing, taking, and uploading a DNA test, requesting and reviewing Nebula's analysis of her genetic test, and continuing over the next several years to review additional information provided by Nebula based on the results of her genetics test.

*B.K. v. Eisenhower Med. Ctr.*, 721 F. Supp. 3d 1056 (C.D. Cal. 2024) is similarly unhelpful to Nebula's argument. Again, as Nebula's own quoted passage shows, the plaintiffs in that case alleged only that they started using a website and thereafter began receiving unsolicited ads, but provided no more information about the alleged disclosures. The Complaint in this case, on the other hand, alleges that Plaintiff took a genetics test and uploaded it to Nebula's website. The Complaint further alleges that Nebula disclosed this information to Meta, Microsoft and Google through their cookies and trackers along with Plaintiff's PII. These allegations alone are sufficient to state a claim under GIPA. 410 ILCS 513/30(a) (prohibiting disclosure of "the identity of any person upon whom a genetic test is performed or the results of a genetic test in a manner that permits identification of the subject of the test").

A more analogous case is *Tracy v. Elekta*, 667 F. Supp. 3d 1276 (N.D. Ga. 2023), in which the plaintiff alleged that his genetic information was provided to the defendant and included in his medical records, which were subsequently breached by a third party. In denying the defendant's motion to dismiss, the Court held that "[t]he allegation that Bowsky's information was provided along with the additional factual contentions Plaintiffs make is sufficient to state a claim for relief under GIPA as to him." *Id.* at 1288. So, too, here – Plaintiff has alleged that she provided her genetic information to Nebula and reviewed analyses of that information on Nebula's website; these allegations, together with the detailed allegations of how Nebula discloses its users' genetic information and PII to Meta, Microsoft and Google via the cookies and trackers on its website, are sufficient to state a claim under GIPA.

Nebula also argues that the GIPA claim should be dismissed because the Complaint does not specifically allege that the various cookies and trackers were installed on the Nebula website during the two-plus years between March of 2021 and July of 2023 that Plaintiff was a Nebula user. This argument elevates form over substance. While it is certainly true that Plaintiff does not (and could not) know when Nebula installed the trackers and thereby began illegally disclosing its users' genetic information, The Complaint plainly alleges that Plaintiff's information was in fact shared via the cookies and trackers. The reasonable inference of these allegations is that Plaintiff is informed and believes that they were in use during the time she was a Nebula user; only Nebula knows these facts, and Plaintiff should be able to prove them through discovery.

### 3. The Complaint Adequately Alleges that Nebula Disclosed Plaintiff's Genetic Information

Nebula's next argument seeks to wholly rewrite GIPA to exclude various categories of genetic information that are expressly set forth in the statute. For example, Nebula argues that GIPA does not cover the information transmitted by the Facebook pixel or Google Tag Manager

that Plaintiff registered a DNA test kit and purchased a testing kit. Nebula acknowledges that the definition of "genetic information" includes a "request for, or receipt of, genetic services," and that "genetic services" is defined to include "(1) A genetic test; (2) Genetic counseling (including obtaining, interpreting, or assessing genetic information); or (3) Genetic education." 45 C.F.R. § 160.103.[3] Nonetheless, Nebula argues in *ipse dixit* fashion that "merely procuring a swab test kit for potential use is not 'requesting a genetic test' within the meaning of GIPA, and therefore is not 'genetic information.'" Dkt. 98 at 17. Nebula provides no support for this assertion, most likely because it makes no sense. If purchasing a genetic test doesn't constitute a "request for, or receipt of," a genetic test, then the statute is without meaning.

Moreover, Nebula glosses over the allegations relating to the other cookies and trackers it has installed on its website. As alleged in the Complaint, the Microsoft Conversion Tracker, like the Facebook pixel, disclosed to Microsoft that Plaintiff had requested genetic services by purchasing and registering her genetic test. Dkt. 1, ¶¶ 58-61. Microsoft Clarity is even more pernicious, as it provides a "session replay" which allows Nebula (and, by extension, Microsoft), to see exactly what information Plaintiff and putative class members were viewing as they reviewed the results of their genetic test. Dkt. 1, ¶¶ 65-68. Accordingly, Nebula's argument that the Complaint does not plausibly allege that Nebula disclosed Plaintiff's genetic information in violation of GIPA is without merit, and provides no basis for dismissal of Plaintiff's claim.

### 4. *Plaintiff has Alleged an Injury Sufficient to Confer Article III Standing*

Nebula's standing argument contends that because Plaintiff has purportedly not alleged facts sufficient to state a GIPA claim, she has also not alleged facts sufficient to meet the injury in fact requirement. As set forth above, however, Plaintiff has alleged detailed facts describing

---

[3] By its terms, GIPA incorporates the HIPAA definitions set forth in 45 C.F.R. § 160.103. 410 ILCS 513/10.

how Nebula shared her genetic information with third parties. Accordingly, Plaintiff is not

relying on injury to any absent class member to establish standing; to the contrary, Plaintiff has

alleged a violation of her own privacy interests.

The Supreme Court has recently reiterated that suits alleging improper disclosure of

private information meet the Article III standing requirement. "Various intangible harms can also

be concrete. Chief among them are injuries with a close relationship to harms traditionally

recognized as providing a basis for lawsuits in American courts. Those include, for example …

disclosure of private information. …" *TransUnion LLC v. Ramirez*, 594 U.S.413, 425 (2021)

(citing *Davis v. Federal Election Comm'n*, 554 U.S. 724, 733 (2008).

Plaintiff has alleged an improper disclosure of her private information which, under

settled Supreme Court law, is sufficient to confer Article III standing.

## IV.    CONCLUSION

For each of the foregoing reasons, Plaintiff respectfully requests that the Court deny

Nebula's motion to dismiss in its entirety, and award Plaintiff such other and further relief the

Court deems just and proper. While the foregoing demonstrates that Plaintiff has adequately pled

her claim for GIPA violations against Nebula, Plaintiff further requests, in the event the Court

deems Plaintiff's factual allegations insufficient, leave to amend the Complaint to remedy any

defects noted by the Court.

Dated: December 16, 2025

RESPECTFULLY SUBMITTED,

By: /s/ Thomas M. Hanson
*One of Plaintiffs' Attorneys*

Mark Loevy-Reyes, BBO No. 707974
Jonathan Loevy*

Michael Kanovitz*
Thomas M. Hanson*
Loevy + Loevy
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607
P: (312) 243-5900
F: (312) 243-5902
hanson@loevy.com
*Admitted *pro hac vice*

17

**<u>CERTIFICATE OF SERVICE</u>**

I, Thomas M. Hanson, an attorney, hereby certify that on December 16, 2025, the

foregoing document was filed using the Court's CM/ECF filing system, which effected service

on counsel of record.

<u>/s/ Thomas M. Hanson</u>
Thomas M. Hanson
